STATE OF NEBRASKA, APPELLEE, V. CHAMU URBANO, ALSO KNOWN AS URBANO CHAMU, APPELLANT.

589 N.W. 2d 144

Filed February 12, 1999.   No. S-98-555.

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

In this direct appeal, Chamu Urbano, also known as Urbano Chamu, appeals his conviction and sentence for assault committed by a confined person, a violation of Neb. Rev. Stat. § 28-932 (Reissue 1995). We affirm Urbano's conviction and the sentence imposed upon him, as modified. In rendering our decision, we consider the impact of recent statutory changes to

the penalties applicable to Class IV felony convictions considered on direct appeal.

## I. STATEMENT OF FACTS

Urbano is an inmate at the Nebraska State Penitentiary. On June 13, 1997, Urbano was housed in the "control unit," a special housing unit within the penitentiary for inmates who have committed disciplinary violations. Qualified health professionals had determined that regulated daily doses of prescription medication would be beneficial to Urbano, including curbing aberrant behaviors such as exhibitionistic exposure of his genitals and violent verbal outbursts. Urbano often refused to voluntarily take the prescribed medication. In the early part of June 1997, a court entered an order authorizing penitentiary officials to administer the prescribed medication to Urbano. This order was mentioned by several trial witnesses, but no copy of it was entered into evidence.

At approximately 1 p.m. on June 13, 1997, penitentiary personnel asked Urbano to take his medication voluntarily. Urbano stated that he would not do so. A team of penitentiary personnel then gathered to perform a "forced cell move," sometimes referred to as a "takedown." At least nine penitentiary employees are required for a forced cell move team. Five guards are assigned to physically move the inmate: one guard for each of the inmate's arms and legs and one guard to walk ahead of the inmate. A team member is present as a "spokesman" to "talk to the camera" used to videotape the forced cell move, to facilitate a complete video record of the move. One team member controls the opening and closing of doors in the control unit. One team member is specifically assigned to videotape the forced cell move process, and another team member acts as the team's supervisor. Because a forced cell move is, by its nature, a physically confrontational process, the penitentiary's team members wear "riot gear" during forced cell moves. This gear consists of a helmet with face shield, a thick vest to protect the team member's torso, elbow pads, and protective gloves. The lower portions of team members' forearms are unprotected by the riot gear.

Team members testified at trial that as they gathered in preparation for the forced cell move, Urbano remained in his

cell, shouting. In a videotape of the forced cell move entered into evidence at trial, Urbano can be heard talking loudly throughout the cell move, although his actual comments are unintelligible. Team members testified that Urbano used foul language and kept repeating that he was a man, that he did not need medication, and that team members would "pay the consequences" for forcing him to take the medication.

Before the team members entered Urbano's cell, a team member again asked Urbano if he would voluntarily take his medication and Urbano was advised that if he did not do so, the team members would use force on Urbano to allow the court-ordered injection of medication. Urbano again refused the medication. Team members then assumed their assigned positions, forcibly restrained Urbano, and carried him into the "bull pen," an open area adjoining the control unit which separates it from the general inmate population areas. Urbano continuously twisted and struggled, shouting profanity.

Cpl. Debbie Finke Proctor, a penitentiary employee, was assigned to restrain one of Urbano's arms during this forced cell move. She had assisted in at least six prior forced cell moves involving Urbano. In the June 13, 1997, cell move of Urbano, Proctor felt someone obstruct the movement of one of her legs. She assumed her leg had been grabbed by a fellow team member in error, and she looked away briefly while still restraining Urbano's arm. As Proctor rapidly turned back to Urbano, she saw him preparing to bite the portion of her left forearm which was not protected by riot gear. Proctor tried to pull her arm away, but she was unable to do so before Urbano made contact with her arm, biting down hard on it. Proctor managed to extricate her arm from Urbano's teeth without halting the progress of the forced cell move. The cell move team transported Urbano to the bull pen, where a nurse injected Urbano with the prescribed drug which was the subject of the court order.

After the forced cell move of Urbano was completed, Proctor showed another team member the injury to her left arm where Urbano had bitten her. Bruises were already becoming evident, and the skin was broken at the site where she had been bitten. Proctor's teammate suggested that she seek medical attention. Proctor was seen at Lincoln General Hospital. The medical care

prescribed for Proctor, which she followed, included a tetanus shot, antibiotics, and a regimen of painfully vigorous wound cleansing several times daily for 2 weeks. By the time of trial, 10 months after the incident, the abrasion and bruises on Proctor's left arm had healed, but a scar from the bite wound was still evident. Proctor testified that she had her blood tested periodically for the 6 months following Urbano's bite on her arm because Urbano had tested positive for hepatitis C and Proctor's physicians were concerned that Urbano might have infected her when he bit her arm.

Urbano was charged on September 27, 1998, with assault by a confined person, which at that time was a Class IV felony, in violation of § 28-932. The case was tried to a jury on February 26 and 27, 1998. Urbano was personally present at all phases of the proceedings with his counsel and a court-appointed interpreter.

At trial, Urbano claimed that he refused to take his medication because the shots administered to him were painful and "[i]t's just like killing my mind." Urbano stated that the medication caused him to be depressed and lethargic and to gain weight. The essence of his defense was that he acted in self-defense and that he did not have the requisite intent to form the crime of assault by a confined person. Urbano testified that in refusing to voluntarily take the medication on June 13, 1997, he did not intend to hurt anyone and that he did not remember biting any of the forced cell move team members. Urbano offered no other evidence in his defense.

Urbano testified that during the forced cell move maneuver, he hit his head against a wall while team members were forcibly restraining him. No injury to Urbano is apparent on the videotape in evidence. The videotape shows that Urbano was restrained and his medication administered to him in a shot and that the penitentiary nurse thereafter asked Urbano if he needed further medical attention. Urbano claimed that his head or face had been hit. However, following an examination of his head and face, the penitentiary nurse advised Urbano that there were no apparent injuries. Urbano's counsel proffered jury instructions on the elements of the crime and self-defense and an instruction regarding Urbano's mental capacity, specifically

questioning whether he could have framed the requisite intent to commit the crime with which he was charged. The trial court refused to give these instructions. Urbano's counsel also objected to the instruction prepared by the trial court defining the elements of the crime of assault by a confined person. The objection was overruled.

The jury found Urbano guilty as charged. On April 23, 1998, the trial court sentenced Urbano to a term of imprisonment of "not less than 5 years nor more than 5 years." Urbano appeals.

## II. ASSIGNMENTS OF ERROR

Urbano claims that the trial court erred in refusing to give jury instructions he proffered regarding the material elements of the crime with which he was charged, self-defense, and his mental condition. Urbano claims that the trial court incorrectly overruled his objection to the jury instruction prepared by the court regarding the elements of the crime of assault by a confined person. Finally, Urbano claims that his sentence is excessive and that, pursuant to recent legislation, his sentence must be reduced.

## III. STANDARD OF REVIEW

In order to establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998).

Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *State ex rel. Wood v. Fisher Foods*, 254 Neb. 982, 581 N.W.2d 409 (1998).

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion. An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Hill*, 255 Neb. 173, 583 N.W.2d 20 (1998).

## IV. ANALYSIS

### 1. JURY INSTRUCTION CLAIMS

Urbano assigns as error the trial court's giving of its instruction No. 3 regarding the elements of the crime of assault by a confined person. Urbano claims that the trial court erred in refusing to give three of his proffered instructions. We find no merit to these claims.

### (a) Elements

Urbano timely objected to the court's jury instruction No. 3 defining the elements of the crime of assault committed by a confined person and instead tendered his own instruction No. 4 to the court regarding the elements of the crime. The court refused to give Urbano's proposed instruction No. 4.

As a general rule, in giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute. *State v. Glantz*, 251 Neb. 947, 560 N.W.2d 783 (1997). At the time of trial, § 28-932 provided, in pertinent part, that "[a]ny person who is legally confined in a jail or correctional or penal institution and intentionally, knowingly, or recklessly causes bodily injury to another person shall be guilty of a Class IV felony[.]" Although Urbano's tendered instruction accurately described the elements defined by § 28-932, it also sought to instruct the jury that as part of the State's initial evidentiary burden, the State had to prove that Urbano did not act in self-defense.

The nature of an affirmative defense is such that the defendant has the initial burden of going forward with evidence of the defense. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). When the defendant has produced sufficient evidence to raise the defense, the issue is then one which the State must disprove. *Id.* If the trial evidence does not support a claim of self-defense, the jury should not be instructed upon it. *Id.* See, also, *State v. Eagle Thunder*, 201 Neb. 206, 266 N.W.2d 755 (1978). An instruction which does not correctly state the law or which is likely to confuse or mislead the jury should not be given. *Glantz, supra.*

Urbano's proposed jury instruction regarding the elements of the crime of assault by a confined person and the defense of

self-defense wrongly shifted the initial evidentiary burden regarding self-defense and was an incorrect statement of the law. The evidence introduced by Urbano at trial did not, even giving Urbano every favorable inference, establish that Urbano acted in justifiable self-defense. The trial court correctly refused to give the jury Urbano's tendered instruction No. 4 regarding the elements of the crime. The trial court's instruction No. 3 regarding the elements of assault by a confined person was an adequate statement of the law, and we find no error in it.

### (b) Self-Defense

Urbano also tendered a separate jury instruction No. 3, which exclusively addressed the issue of self-defense. The trial court refused this instruction on the basis that the trial evidence did not support the instruction.

A trial court must instruct the jury on the issue of self-defense when there is any evidence adduced which raises a legally cognizable claim of self-defense. *Kinser, supra.* To successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances. *State v. Marshall,* 253 Neb. 676, 573 N.W.2d 406 (1998).

Justifications for the use of force in self-defense are statutorily defined, and the defendant bears the initial burden to produce evidence which supports a claim of self-defense. *Kinser, supra.* It is only *unlawful* force directed at a defendant which provides a justifiable basis for self-defense. See Neb. Rev. Stat. § 28-1409 (Reissue 1995). See, also, *State v. Graham,* 234 Neb. 275, 450 N.W.2d 673 (1990). If a defendant has unjustifiably placed himself or herself in harm's way, a court may properly find that such facts do not support a lawful claim of self-defense. See *Marshall, supra.*

Urbano claims that he was justified in biting Proctor in self-defense because he felt the force used by the cell move team was excessive, he did not want to receive the injection of medication, and he did not think he needed it. In an inconsistent claim, Urbano also argues that he had no memory of biting Proctor. In any event, Urbano does not deny that the medication administered to him was given pursuant to a court order, albeit

against his will. Furthermore, at trial and on appeal, Urbano has not questioned the validity of the court order.

Beyond recounting his own feelings, Urbano produced no evidence that the forced cell move was illegal, that penitentiary personnel conducted it illegally, or that penitentiary personnel acted in an unduly aggressive manner or acted outside the scope of their authority and penitentiary rules and regulations. In rejecting Urbano's proposed self-defense jury instruction, the trial court stated that the evidence at trial did not show that the forced cell move of Urbano was unlawful. We agree with this conclusion.

Neb. Rev. Stat. § 28-1414 (Reissue 1995) defines certain circumstances which preclude a claim of self-defense. These include instances in which, inter alia, a defendant unjustifiably acts in self-defense, negligently or recklessly believing that unlawful force is being used against him or her. See *id.* While Urbano opined at trial that he thought the forced cell move team members treated him unnecessarily roughly, he introduced no evidence beyond his own opinion that this was so. The remaining evidence introduced at trial pertaining to the forced cell move was produced by the State, all of which tended to establish that the cell move was initiated only after Urbano refused to take medication which he knew was court ordered, that the cell move was accomplished by the use of appropriate standardized takedown procedures, and that Urbano was physically resistant throughout the episode.

A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record. See *State v. Glantz*, 251 Neb. 947, 560 N.W.2d 783 (1997). We conclude on this record that there was no evidence to support Urbano's claim that he justifiably bit Proctor's arm in self-defense. The trial court properly refused Urbano's tendered instruction No. 3 regarding self-defense.

### (c) Mental Capacity

Urbano tendered instruction No. 2 regarding mental capacity. Urbano's proposed instruction No. 2 reads: "Any evidence received concerning defendant's mental condition bears only on the presence or absence of the intent necessary to prove the

crime charged." Urbano claims that the trial court erred in refusing to give this instruction, because according to *State v. Vosler*, 216 Neb. 461, 468, 345 N.W.2d 806, 811 (1984), "evidence of an accused's mental condition at the time the offense was committed is always admissible to prove absence of intent." As a threshold matter, we note that proposed instruction No. 2 fails to recite the entire proposition of law in *Vosler*, which limits its holding to the facts of the *Vosler* case. Proposed instruction No. 2 does not accurately summarize the law in *Vosler* and is, at best, confusing, and the trial court correctly rejected it on these bases.

A review of the evidence shows that Urbano testified that he was given medication against his will daily during the 3 weeks preceding his assault on Proctor and that his thought processes were detrimentally altered. Urbano testified that he did not remember biting Proctor and that he did not intend to hurt anyone. Urbano claims that the jury could have found from the trial evidence that he was not mentally competent to form the intent which is a prerequisite to the crime with which he was charged and, therefore, that the trial court erroneously refused his proposed instruction concerning his mental condition and the significance thereof.

At first blush, Urbano's argument seems to be based on the insanity defense found in Neb. Rev. Stat. § 29-2203 (Reissue 1995). It is well settled that when a defendant pleads insanity and offers evidence on that issue, the plea is an implicit, although not legally operative, admission of the State's charges. *Vosler, supra.* Section 29-2203 provides that if a defendant intends to assert the defense that he or she is not guilty by reason of insanity, the defendant must provide the prosecution and court with notice of the defense at least 60 days before trial, and that the burden of proving the defense is upon the defendant. In the instant case, Urbano did not give the court or the prosecution advance notice of a purported insanity defense, nor did Urbano plead that he was insane. On the contrary, he pled and consistently maintained that he was not guilty throughout the proceedings. Accordingly, we do not view the defense theory expressed in Urbano's proffered instruction as one based on insanity.

Separate and apart from an insanity defense, a defendant may, with appropriate evidence, try to defeat the charge filed against him or her by proving that at the time the offense occurred, the defendant lacked the ability to intend the voluntary and probable consequences of his or her act. We noted in *State v. Vosler*, 216 Neb. 461, 468, 345 N.W.2d 806, 811 (1984), that "although there is but one type of insanity which will support a finding of not guilty or not responsible by reason of insanity, there are a variety of mental conditions which bear upon the ability to form a specific intent." The defense implicit in Urbano's tendered jury instruction No. 2 appears akin to a claim of temporarily diminished capacity, that is, Urbano seems to claim that his mental condition on the day he bit Proctor was so diminished by the accumulated medication which he had received for the preceding 3 weeks that he was incapable of intentionally, knowingly, or recklessly biting Proctor.

A trial court need not specially instruct the jury regarding the defense of diminished capacity if the court has otherwise properly instructed the jury regarding the intent which is an element of the crime charged. *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989), *cert. denied* 498 U.S. 881, 111 S. Ct. 216, 112 L. Ed. 2d 176 (1990), relying upon *Vosler, supra,* and *Starkweather v. State*, 167 Neb. 477, 93 N.W.2d 619 (1958). We have reviewed the court's instructions in this case. The instructions given by the trial court to the jury properly articulated the intent which is a prerequisite to the crime of assault by a confined person, according to § 28-932. To the extent that Urbano was entitled to an instruction regarding intent, the jury instructions adequately covered this topic. We conclude, therefore, that the trial court did not err in refusing to instruct the jury on mental capacity as requested by Urbano in proffered instruction No. 2.

## 2. EXCESSIVE SENTENCE CLAIM

Upon conviction, Urbano was sentenced on April 23, 1998, to a term of imprisonment of "not less than 5 years nor more than 5 years." He contends that the sentence imposed upon him was excessive, and, in any event, he requests that we modify the minimum portion of it based on recent statutory amendments regarding Class IV felony indeterminate sentences. Urbano pre-

sumes that he received an indeterminate sentence and notes that the minimum for a Class IV felony indeterminate sentence, when an indeterminate sentence of imprisonment is imposed, cannot now exceed 20 months' imprisonment, pursuant to statutory amendments contained in 1997 Neb. Laws, L.B. 364. The State claims that Urbano cannot take advantage of the new maximum minimum provision of 20 months' imprisonment for a Class IV felony indeterminate sentence, because the crime of which he stands convicted has been reclassified as a Class IIIA felony and because the Legislature has indicated an intent that the amelioratory effects of the amendments do not apply to defendants sentenced before July 1, 1998, by virtue of 1998 Neb. Laws, L.B. 1073. We do not agree. As explained more fully below, we conclude that the sentence imposed on Urbano was indeterminate, and we modify the minimum portion of the sentence to 20 months' imprisonment and affirm as modified.

Nebraska's sentencing statutes have been significantly amended in recent years. Sentences imposed for felony convictions are governed by the range of penalties set forth at Neb. Rev. Stat. § 28-105 et seq. (Reissue 1995 & Cum. Supp. 1998). In addition, Neb. Rev. Stat. § 29-2204 (Cum. Supp. 1998) and Neb. Rev. Stat. § 83-1,105.01 (Cum. Supp. 1998) also impact criminal sentences imposed by trial courts and reviewed by appellate courts. In general, these statutes provide respectively, inter alia, for the imposition of indeterminate sentences and calculation of time to be served. Reference to these statutes and amendments thereto is made later in our analysis of Urbano's sentencing claim.

### (a) *Randolph* Doctrine

Although the sentence of the district court was not an abuse of discretion, the Legislature has amended the indeterminate sentencing statute and we are compelled to consider if the amendment has any effect on Urbano's sentence. At the time the district court entered the sentence in this case on April 23, 1998, § 29-2204 (Reissue 1995) provided, in relevant part, that "in imposing an indeterminate sentence upon an offender, the court shall: . . . [f]ix the minimum and maximum limits of the sentence to be served within the limits provided by law . . . ." In

1997, the Legislature amended this provision by 1997 Neb. Laws, L.B. 364, however, to provide that where the criminal offense for which an indeterminate sentence is to be imposed is a Class IV felony, "the court shall fix the minimum and maximum limits of the sentence, but the minimum limit fixed by the court shall not be . . . more than one-third of the maximum term . . . ." § 29-2204 (Supp. 1997). The operative date of this amendment was July 1, 1998.

The law is well settled in Nebraska that where a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically indicated otherwise. *Jones v. Clarke*, 253 Neb. 161, 568 N.W.2d 897 (1997); *State v. Groff*, 247 Neb. 586, 529 N.W.2d 50 (1995); *State v. Schrein*, 247 Neb. 256, 526 N.W.2d 420 (1995); *State v. Randolph*, 186 Neb. 297, 183 N.W.2d 225 (1971), *cert. denied* 403 U.S. 909, 91 S. Ct. 2217, 29 L. Ed. 2d 686; *State v. Bennett*, 2 Neb. App. 188, 508 N.W.2d 294 (1993). This principle is sometimes referred to as "the *Randolph* doctrine." A sentence is not a final judgment until the entry of a final mandate of an appellate court if an appeal is taken. *Jones v. Clarke, supra*; *State v. Schrein, supra*. See *State v. Bennett, supra*. The amendment in the present case occurred after the criminal activity but prior to the final judgment announced herein.

### (b) Amendments to Sentencing Statutes

#### (i) Amendments Pertaining to Reclassification of Assault by Confined Person

The State contends that Urbano's sentence cannot be reduced, because the crime of which Urbano was convicted, under § 28-932, assault by a confined person, has since been reclassified from a Class IV felony to a Class IIIA felony. The crime of assault by a confined person was classified in § 28-932 as a Class IV felony on June 13, 1997, the date that Urbano bit Proctor; on September 29, 1997, the date upon which he was charged with the crime; on February 26 and 27, 1998, the dates during which Urbano was tried on those charges; on April 23, 1998, the date upon which Urbano was sentenced; and on May

4, 1998, the date Urbano filed his notice of appeal. The operative date of the amendment to § 28-932 which reclassified the crime of assault by a confined person from a Class IV felony to a Class IIIA felony was July 1, 1998.

The reclassification of the crime of which Urbano was convicted obviously increases the severity of the classification. It also increases the potential punishment, because the minimum portion of a Class IIIA felony indeterminate sentence is unrestricted. That is, there is no upper limit on the minimum term of a Class IIIA felony indeterminate sentence, whereas the maximum minimum of a Class IV felony indeterminate sentence cannot now exceed one-third of the maximum sentence allowed by law, i.e., 20 months' imprisonment. The greatest possible minimum term in an indeterminate sentence for a Class IV felony would be 20 months' imprisonment, which is one-third of 5 years. In contrast, for example, while an indeterminate sentence of 4 to 5 years' imprisonment would be permissible for a Class IIIA felony, it could not be imposed for a Class IV felony.

A law which purports to apply to events that occurred before the law's enactment, and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed, is an ex post facto law and will not be endorsed by the courts. *Weaver v. Graham*, 450 U.S. 24, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981); *Groff, supra.* The ex post facto analysis applies where a statutory amendment changes the punishment of a crime, and it may also be applied where there is a change in the classification of a crime. See, *State v. Peiffer*, 212 Neb. 864, 326 N.W.2d 844 (1982); *State v. Crisp*, 195 Neb. 833, 241 N.W.2d 129 (1976).

The statutory reclassification amendment to § 28-932 did not become operative until after every material stage of the judicial process in the trial court was complete. The amendment to § 28-932 classifies the crime as more severe and creates a potentially harsher minimum punishment than that which is permitted for Class IV felonies. When an amendment or change to a statute imposes a more burdensome punishment than existed when the crime was committed, it runs afoul of ex post facto principles and it is not, therefore, applied. *State v. Groff*, 247 Neb. 586, 529 N.W.2d 50 (1995). We conclude that apply-

ing the amendatory terms to § 28-932 in Urbano's case and applying the corresponding penalties would convert his Class IV felony conviction into a Class IIIA conviction and amount to an impermissible ex post facto application of the new law. Therefore, we reject the State's argument that Urbano's sentence cannot be modified because the crime of which Urbano stands convicted has been transformed from a Class IV to a Class IIIA felony effective July 1, 1998. The crime of which Urbano was convicted is a Class IV felony, which we do not reclassify on appeal to a Class IIIA felony.

### (ii) Amendments Contained in L.B. 1073

The State argues that the *Randolph* doctrine cannot be invoked to lessen the minimum term of an indeterminate sentence in *any* Class IV felony case pending before July 1, 1998. The State notes that 1998 Neb. Laws, L.B. 1073, resulted in 1998 amendments to § 29-2204 which became operative on April 15, 1998, approximately 2½ months before the 1997 amendments pertaining to, inter alia, reclassification and Class IV sentencing parameters became operative. The State argues that the 1998 amendments curtailed application of the 1997 amendments generally and, in particular, caused the 1997 amendments to be inapplicable to cases pending before July 1, 1998. We do not agree.

A careful examination of the legislative history of L.B. 1073 shows that the 1998 Legislature did not debate the limiting language upon which the State relies and which the State claims restricts the courts' ability to apply the ameliorative benefits of the 1997 amendments to § 29-2204 to Class IV felony cases. That is, the Legislature did not specifically indicate that criminal appellants could not take advantage of the amendatory acts which mitigate the punishments for Class IV felonies.

The pertinent changes effected upon § 29-2204 by L.B. 1073 under discussion are set forth below, denoted by underlining and italics. The italicized portions are at issue in this discussion.

29-2204. (1) Except when a term of life is required by law, in imposing an indeterminate sentence upon an offender the court shall:

(a)(i) *Until July 1, 1998, fix the minimum and maximum limits of the sentence to be served within the limits provided by law, except that when a maximum limit of life is imposed by the court for a Class IB felony, the minimum limit may be any term of years not less than the statutory mandatory minimum; and*

*(ii) Beginning July 1, 1998:*

*(A)* Fix the minimum and maximum limits of the sentence to be served within the limits provided by law for any class of felony other than a Class IV felony, except that when a maximum limit of life is imposed by the court for a Class IB felony, the minimum limit may be any term of years not less than the statutory mandatory minimum. If the criminal offense is a Class IV felony, the court shall fix the minimum and maximum limits of the sentence, but the minimum limit fixed by the court shall not be less than the minimum provided by law nor more than one-third of the maximum term and the maximum limit shall not be greater than the maximum provided by law[.]

(Emphasis supplied.) Laws of Nebraska, L.B. 1073, 95th Leg., 2d Sess. 408.

The legislative history shows that as finally approved and passed by the Legislature, L.B. 1073 was an amalgamation of substantive issues culled from more than 10 legislative bills. L.B. 1073 included such diverse topics as housing standards and manufactured homes, juvenile justice mediation, restriction of imposition of the death penalty on mentally retarded persons, hospital clinical privileges, the State's brain injury registry, and state personnel matters, as well as amendments to § 29-2204. Although there was debate as to some of these matters, e.g., restriction of imposition of the death penalty on mentally retarded persons, the members of the Legislature did not draft or debate the amendment to § 29-2204 designated by the italicized text above. The history of L.B. 1073 as it evolved in the legislative process shows that the first time the amendatory terms "Until July 1, 1998" and "Beginning July 1, 1998" appeared in L.B. 1073 was after the bill had been sent to and returned from the state Revisor of Statutes for "enrollment and review."

The Revisor of Statutes is empowered by Neb. Rev. Stat. § 49-701 et seq. (Reissue 1998), in preparing supplements and reissued or replacement volumes of the Nebraska Revised Statutes, to renumber and rearrange statutory sections, to remove obsolete matter within any section, and to harmonize provisions of Nebraska's statutes. See § 49-705. See, also, *Duggan v. Beermann*, 249 Neb. 411, 544 N.W.2d 68 (1996). The Revisor of Statutes is obligated by law to print and publish the laws as enacted by the Legislature and to not exercise discretion in excising a portion of the law. See *State ex rel. Wright v. Pepperl*, 221 Neb. 664, 380 N.W.2d 259 (1986). These principles apply to making unauthorized additions to statutes. The Revisor of Statutes cannot make corrections or modifications which change the substantive meaning of a statute as enacted by the Legislature. *Stuthman v. Stuthman*, 245 Neb. 846, 515 N.W.2d 781 (1994).

The effect of the terms which emerged following review by the Revisor of Statutes and were added to § 29-2204 as shown by the italicized text above is substantive. These terms appear to restrict a Class IV felony criminal appellant's ability under § 29-2204 to request a court, pursuant to the 1997 amendments, to modify downward the minimum portion of an indeterminate sentence in a case pending before July 1, 1998. The application of the 1998 terms to the 1997 amendments runs afoul of the notion expressed in *State v. Randolph*, 186 Neb. 297, 183 N.W.2d 225 (1971), *cert. denied* 403 U.S. 909, 91 S. Ct. 2217, 29 L. Ed. 2d 686, in which we said that " '[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient *should* apply to every case to which it constitutionally *could* apply.' " (Emphasis supplied.) *Id.* at 302, 183 N.W.2d at 228, relying on *In re Estrada*, 63 Cal. 2d 740, 408 P.2d 948, 48 Cal. Rptr. 172 (1965). As noted above, *Randolph* further stands for the principle that if a relevant statute is amended during the pendency of a criminal case and the amendment works to the benefit of a criminal defendant, the court should apply the amendatory terms absent a specific expression of contrary legislative intent, " 'because to hold otherwise would be to conclude that the Legislature was motivated by a desire for

vengeance, a conclusion not permitted in view of modern theories of penology.'" *Randolph*, 186 Neb. at 302, 183 N.W.2d at 228.

Nothing in the legislative history of L.B. 1073 evidences a specific legislative intent to deviate from the *Randolph* doctrine, and there is no hint of a "desire for vengeance" by the 1998 Legislature that the 1997 amelioratory amendments should not apply to cases concluded at the trial level before, but pending on appeal after, July 1, 1998. The 1998 amendatory terms, which were added to § 29-2204 by the Revisor of Statutes, do not evidence a specific expression of legislative intent to deny a criminal appellant the ameliatory provisions of the 1997 amendments, and the 1998 amendments do not restrict a criminal appellant's ability to request a court to reduce the minimum portion of his or her indeterminate sentence in a Class IV felony case in which sentencing occurred before July 1, 1998, but was pending on direct appeal after July 1, 1998. The terms added upon review by the Revisor of Statutes in this instance do not inhibit an appellate court's authority under the *Randolph* doctrine to reduce the minimum portion of a Class IV felony defendant's indeterminate sentence in an appropriate direct appeal pursuant to the 1997 amendments to § 29-2204. See, e.g., *State v. Karel*, 204 Neb. 573, 284 N.W.2d 12 (1979) (holding that defendant's right to jury trial was not defeated by substantive statutory changes improperly made by Revisor of Statutes).

With respect to its argument that due to the 1998 amendments, the 1997 amendments may not be invoked by defendants whose cases were pending before July 1, 1998, the State further claims that the 1998 amendments also apply to § 83-1,105.01 and were § 83-1,105.01 amended in a manner similar to § 29-2204, such amendment would preclude a reduction in sentence.

The provisions in § 83-1,105.01 generally provide for the method of calculating credit for time served. In connection with its argument, the State acknowledges that unlike § 29-2204, the 1998 amendments did not amend § 83-1,105.01. The State claims, however, that we should treat § 83-1,105.01 as having been *impliedly* amended by the 1998 amendments because "the

two statutes [§§ 29-2204 and 83-1,105.01] are essentially identical, [and] what the Legislature intended with respect to § 29-2204 with respect to indeterminate sentences for Class IV felonies also must have been intended with respect to the like provision in Neb. Rev. Stat. § 83,105.01 [sic]." Brief for appellee at 9. This argument is unpersuasive.

This court has reviewed the relevant legislative history recited above. Nothing in the legislative history of 1998 Neb. Laws, L.B. 1073, suggests that the Legislature intended to amend § 83-1,105.01. Even a casual reading of the two statutes shows that §§ 29-2204 and 83-1,105.01 are not "essentially identical," as claimed by the State, with respect to, inter alia, their titles, purposes, or terms.

Chapter 29 is entitled "Criminal Procedure," and article 22, in which § 29-2204 is found, is reserved for statutes governing "Judgment on Conviction." In contrast, chapter 83 is entitled "State Institutions," and article 1 is reserved for statutes governing "Management." This article is devoted to the creation and management of numerous state agencies, including a subchapter devoted to the Department of Correctional Services and the Office of Parole Administration. Section 83-1,105.01 is found within the portion of Chapter 83 which addresses parole administration, including, inter alia, the calculation of and apportionment of credit for time served against the minimum and maximum terms of an inmate's sentence.

Although there are similarities as to some portions of § 29-2204 and § 83-1,105.01, we will not presume that the Legislature "intended" to restrictively amend § 83-1,105.01 in the same manner as § 29-2204 was amended. Absent evidence of legislative intent to modify existing statutes or ordinances, we ordinarily do not assume the existence of such intent. See, e.g., *Hammond v. City of Broken Bow*, 239 Neb. 437, 476 N.W.2d 822 (1991). Indeed, when legislation is enacted which makes related preexisting law applicable thereto, it is presumed that the Legislature acted with full knowledge of the preexisting law and judicial decisions of the Supreme Court construing and applying it. *SID No. 1 v. Nebraska Pub. Power Dist.*, 253 Neb. 917, 573 N.W.2d 460 (1998). See, also, *Sidney Education Assn. v. School Dist. of Sidney*, 189 Neb. 540, 203 N.W.2d 762 (1973).

The legislative history surrounding the 1998 amendment to § 29-2204 contains no evidence of legislative intent to amend § 83-1,105.01. It is not for this court to judicially infer legislative amendatory intent where none is manifest in the legislative history. We therefore conclude that the 1998 amendatory language appended to § 29-2204 is limited to § 29-2204.

In sum, the 1998 amendments to § 29-2204 do not limit a Class IV felony defendant's ability to request an appellate court to review or modify the minimum portion of his or her indeterminate sentence upon direct appeal and they do not restrict a court's authority to evaluate and apply the *Randolph* doctrine in such direct appeals where it is appropriate to do so. See *State v. Harris*, 7 Neb. App. 520, 583 N.W.2d 366 (1998) (modifying minimum term of Class IV felony indeterminate sentence on direct appeal, pursuant to 1997 legislative amendment).

### (c) Indeterminate and Determinate Sentences and Modification of Urbano's Sentence

Sections 29-2204, as amended in 1997, and 83-1,105.01 now provide that Class IV felonies are subject to the requirement that the minimum term of an indeterminate sentence not exceed one-third of the maximum term. Urbano was convicted of a Class IV felony. He was sentenced to a term of imprisonment of "not less than 5 years, and not more than 5 years." Urbano claims that by expressly articulating a minimum and maximum term of imprisonment, the trial court sentenced him to an indeterminate sentence susceptible to downward adjustment based upon the 1997 amendments. We agree.

Sections 29-2204, as amended, and 83-1,105.01 impose the condition that the minimum term of an indeterminate sentence may not exceed one-third of the maximum and are reminiscent of the indeterminate sentencing scheme used in Nebraska courts before 1993. See, e.g., *State v. Hedglin*, 192 Neb. 545, 222 N.W.2d 829 (1974). In 1993, the Legislature abolished the limit on the length of the minimum term in an indeterminate sentence and replaced it with the rule that the minimum term of an indeterminate sentence could be any term within the sentencing range prescribed by statute. See, e.g., *State v. Chojolan*, 253 Neb. 591, 571 N.W.2d 621 (1997); *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997).

Determinate sentences were also affected by the 1993 legislation. Before 1993, the maximum term of imprisonment served by a defendant under a determinate sentence was considered to be the sentence pronounced by the court. A defendant's release from incarceration might, however, occur before he or she had served the amount of time specified in a determinate sentence, because the "minimum" term of a determinate sentence was considered to be the minimum term provided by law. See, e.g., *Hedglin, supra.* See, also, *State v. Blazek*, 199 Neb. 466, 259 N.W.2d 914 (1977).

The minimum portion of a term of imprisonment, be it expressly articulated by the trial court in an indeterminate sentence or determined as a matter of law from the statute defining the range of penalties for a specific crime, provides a basis for calculating the amount of time a defendant must actually serve a sentence of imprisonment before he or she is initially considered eligible for parole. See, e.g., Neb. Rev. Stat. § 83-1,110 (Cum. Supp. 1998). See, also, *Blazek, supra.* During the period from 1993 through the operational date of the 1997 amendments, there was no statutory requirement that separate or differing minimum and maximum terms of imprisonment be imposed. See *State v. Cook*, 251 Neb. 781, 559 N.W.2d 471 (1997) (holding that imposition of sentence of imprisonment of 20-year minimum and 20-year maximum was not an abuse of discretion). The law required pronouncement of a maximum sentence. See *State v. Bensing*, 249 Neb. 900, 547 N.W.2d 464 (1996). Between 1993 and 1997, where a sentencing court imposed a sentence in which the minimum-to-maximum range was the same number, under the sentencing scheme then in effect, the sentence could be considered "determinate" for calculation of credit purposes, *State v. DuBray*, 5 Neb. App. 496, 560 N.W.2d 189 (1997), and the sentencing statutes did not require that the minimum sentence be for a different term than the maximum sentence, *Cook, supra.*

*Cook* and *DuBray* were correct statements of the law regarding sentencing requirements against the backdrop of a sentencing scheme different from that now in effect. Those cases are now distinguishable because § 29-2204 has been amended and they are inconsistent with § 83-1,105.01 as it now exists. The

1997 amendment to § 29-2204 and § 83-1,105.01 substantially changed the sentencing scheme. Now, an indeterminate sentence for a Class IV felony is subject to the limitations discussed above on the minimum portion of the sentence. See §§ 29-2204(a)(i) and 83-1,105.01(1). A sentence articulated now as one number and without any indication of a sentencing range is considered as having an implied minimum term equal to the minimum punishment allowed by statute. See, §§ 29-2204(a)(ii) and 83-1,105.01(2); *Blazek, supra.*

Urbano was convicted of assault by a confined person. As noted above, we conclude that although the crime has been reclassified from a Class IV felony to a Class IIIA felony, Urbano remains convicted of a Class IV felony. Urbano was sentenced to a range of "not less than 5 years, nor more than 5 years," a sentence that was valid at the time it was imposed. In this case, the sentencing court imposed an indeterminate term of imprisonment for Urbano's Class IV felony conviction, in which the minimum term of imprisonment was 5 years and the maximum term of imprisonment was 5 years. The trial court stated the maximum permissible term of imprisonment which it intended that Urbano serve, which the court was obligated to do. See *State v. Bensing, supra.* However, the minimum term of imprisonment stated by the court, i.e., 5 years, is inconsistent with §§ 29-2204 as amended in 1997 and 83-1,105.01, operative July 1, 1998, which now limit the minimum term of imprisonment for an indeterminate sentence imposed for a Class IV felony to a maximum of 20 months. Under these facts, this court may correct this error on direct appeal by modifying the minimum portion of Urbano's sentence so that it does not exceed the maximum minimum permitted by law for a Class IV felony indeterminate sentence. See *State v. Hedglin*, 192 Neb. 545, 222 N.W.2d 829 (1974). In doing so, we note that this is not a case in which we must consider the aggregate effect of several sentences to be served concurrently. Such facts might yield a different conclusion. See *Blazek, supra.* We also observe that the benefit of the *Randolph* doctrine available to Urbano on direct appeal of his criminal conviction is not available as a basis for postconviction relief.

To summarize, Urbano was convicted of a Class IV felony, the maximum punishment for which is 5 years' imprisonment. The sentence imposed on Urbano was correct when imposed. The 5-year maximum term of imprisonment imposed by the trial court in this indeterminate sentence is consistent with the range of permissible penalties set forth in § 28-105, and we need not modify it. However, in order to conform to the terms of §§ 29-2204 and 83-1,105.01 now in effect, the minimum term of Urbano's indeterminate sentence cannot exceed 20 months' imprisonment, which is one-third of the statutory maximum punishment of 5 years' imprisonment. This court has interpreted the phrase "maximum term," for purposes of determining the minimum portion of an indeterminate sentence, as referring to the maximum term provided by law. *State v. Ford*, 194 Neb. 400, 231 N.W.2d 515 (1975). In the instant case, the maximum of 5 years' imprisonment is permissible and the maximum minimum permissible is 20 months' imprisonment. We therefore modify Urbano's sentence to a term of 20 months' to 5 years' imprisonment.

(d) Modification Based on Abuse of Discretion

Urbano also appeals for further reduction of his sentence pursuant to this court's power to modify criminal sentences. See Neb. Rev. Stat. § 29-2308 (Reissue 1995).

In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Chojolan*, 253 Neb. 591, 571 N.W.2d 621 (1997).

Urbano is 34 years old. Prior to the conviction which is the subject of the instant case, Urbano was convicted of six felonies in California and Nebraska, including robbery, theft, and selling and transporting narcotics. He had also been convicted of and imprisoned for numerous misdemeanor assault and battery charges. Urbano has operated under at least six known aliases in the course of his criminal career. At the time of his assault on Proctor, Urbano was serving a sentence at the Nebraska State

Penitentiary for felony receipt of stolen property. He had been confined to the penitentiary's control unit since 1994.

We do not agree with Urbano that the sentence imposed upon him is excessive or constitutes an abuse of discretion by the trial court. The sentence as modified is affirmed.

### V. CONCLUSION

Urbano's conviction is affirmed. Urbano's sentence, as modified, is affirmed. Urbano's sentence as modified is 20 months' to 5 years' imprisonment.

AFFIRMED AS MODIFIED.

CONNOLLY, J., concurs.