TERLE SLANSKY, APPELLANT, V.
NEBRASKA STATE PATROL, APPELLEE.
685 N.W.2d 335

Filed July 16, 2004. No. S-03-747.

Bradley D. Holbrook, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellant.

Jon Bruning, Attorney General, and Mark D. Starr for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.
In 1985, Terle Slansky was convicted pursuant to jury verdict of, inter alia, rape and attempted rape, and was sentenced to a term of 15 to 20 years' imprisonment in Kansas. After his release

from prison, Slansky moved to Nebraska and the Nebraska State Patrol (NSP), pursuant to the Sex Offender Registration Act (SORA), Neb. Rev. Stat. § 29-4001 et seq. (Cum. Supp. 2000), determined that Slansky was at a high risk to reoffend sexually and classified him as a Level 3 sex offender. Slansky appealed, and the district court affirmed the NSP's determination. On appeal, Slansky contends that SORA is unconstitutional, the risk assessment instrument used by the NSP to classify sex offenders is invalid, and the evidence was insufficient to classify him as a Level 3 sex offender. For the following reasons, we affirm the judgment of the district court.

## I. SORA

Because Slansky challenges numerous aspects of SORA, we begin by outlining some of its pertinent features, as well as the applicable rules and regulations that implement SORA. Similarly, because Slansky questions the validity of the risk assessment instrument that was developed to classify offenders, we briefly set forth its contours.

In 1994, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, see 42 U.S.C. § 14071 et seq. (2000), which conditioned certain federal funding on a state's adoption of sex offender registration laws within 3 years. See, *Smith v. Doe*, 538 U.S. 84, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003); *Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999). In response, the Legislature enacted SORA in 1996. Although there have been a number of amendments to SORA since 1996, see § 29-4001 et seq. (Cum. Supp. 1998 & 2002) and 2004 Neb. Laws, L.B. 943, 98th Leg., 2d Session (2004), we review SORA as it existed at the time the NSP conducted Slansky's assessment in January 2000.

In enacting SORA, the Legislature stated that it was attempting to protect communities by assisting law enforcement agencies in identifying potential repeat sex offenders. See § 29-4002. In this regard, SORA applies to any person who on or after January 1, 1997, (1) pleads guilty to or is found guilty of one of a number of enumerated offenses, most of which are sexual in nature; (2) enters the State of Nebraska after having pled guilty to or been found guilty of any offense in another state that is

substantially equivalent to one of the enumerated offenses; or (3) is incarcerated or is under probation or parole as a result of pleading guilty to or being found guilty of a registrable offense under (1) or (2). See § 29-4003.

Any person subject to SORA must register with the sheriff of the county in which he or she resides within 5 days of becoming subject to SORA. § 29-4004. Registration requires a person to provide, inter alia, his or her name, aliases, date of birth, Social Security number, photograph, fingerprints, current address, place of employment or vocation, any school he or she is attending, a listing of registrable offenses the individual has pled guilty to or been found guilty of, the jurisdiction where the offense was committed, and the name and location of each jail or penal facility in which the person was incarcerated. § 29-4006(1). Such information is then forwarded to the NSP, which must maintain a central registry of persons obligated to register under SORA. § 29-4004.

Although information obtained under SORA was at one time restricted to law enforcement agencies and their authorized personnel, see § 29-4009(1) (Cum. Supp. 1996), this restriction was eliminated in 1998. Under the amendments passed in 1998, in addition to disclosing information obtained under SORA to law enforcement agencies for law enforcement purposes and governmental agencies conducting confidential background checks, the NSP and any law enforcement agency authorized by the NSP may release relevant information concerning the person if it is necessary to protect the public. § 29-4009(1) through (3).

Whether to release information concerning a person subject to SORA to the public is essentially a question about the person's risk of recidivism. See § 29-4013. Generally speaking, the NSP is required to assign a notification level, based on the risk of recidivism, to every person subject to SORA. § 29-4013(2)(e). If the risk of recidivism is low, the person is classified as a Level 1 offender and law enforcement officials who are likely to encounter the offender must be notified. § 29-4013(2)(c)(i). If the risk of recidivism is moderate, the person is classified as a Level 2 offender and schools, daycare centers, and religious and youth organizations must also be notified. § 29-4013(2)(c)(ii). If the risk of recidivism is high, the person is classified as a Level

3 offender and notice must be given to members of the public who are likely to encounter the offender, in addition to those groups that are required to be notified if a person is classified as a Level 1 or 2 offender. § 29-4013(2)(c)(iii).

In order to determine an offender's appropriate classification level, SORA directs the NSP to adopt rules and regulations that identify and incorporate factors that are relevant to a sex offender's risk of recidivism. See § 29-4013. SORA states in part:

> Factors relevant to the risk of recidivism include, but are not limited to:
>
> (i) Conditions of release that minimize the risk of recidivism, including probation, parole, counseling, therapy, or treatment;
>
> (ii) Physical conditions that minimize the risk of recidivism, including advanced age or debilitating illness; and
>
> (iii) Any criminal history of the sex offender indicative of a high risk of recidivism, including:
>
> (A) Whether the conduct of the sex offender was found to be characterized by repetitive and compulsive behavior;
>
> (B) Whether the sex offender committed the sexual offense against a child;
>
> (C) Whether the sexual offense involved the use of a weapon, violence, or infliction of serious bodily injury;
>
> (D) The number, date, and nature of prior offenses;
>
> (E) Whether psychological or psychiatric profiles indicate a risk of recidivism;
>
> (F) The sex offender's response to treatment;
>
> (G) Any recent threats by the sex offender against a person or expressions of intent to commit additional crimes; and
>
> (H) Behavior of the sex offender while confined.

§ 29-4013(2)(b).

Relying on these factors, the NSP's rules and regulations, adopted and promulgated pursuant to § 29-4013, identify factors that mitigate against the risk of recidivism, as well as factors that increase the risk of recidivism. Factors which were determined to reduce the risk of recidivism included (1) conditions of release such as supervised probation or parole; (2) counseling, therapy, or treatment following release; and (3) physical conditions such as advanced age or debilitating illness. 272 Neb.

Admin. Code, ch. 19, § 012.03(A) through (C) (2000). Factors that were identified as increasing the risk of recidivism included (1) criminal history of the offender; (2) repetitive or compulsive behavior including the number of sex-related charges and convictions and offenses committed while confined or on supervised release; (3) age of the victim; (4) age at which the offender was first charged with a sex offense; (5) relationship of the offender to the victim; (6) convictions for sex offenses in jurisdictions other than Nebraska; (7) control of the victim through the threat or use of weapons, force, or violence, or the infliction of serious injury; (8) indications of a risk of recidivism in psychological or psychiatric profiles; (9) the offender's response to treatment; and (10) behavior of the offender while confined. 272 Neb. Admin. Code, ch. 19, § 012.04(A) through (J) (2000). Moreover, the following four factors were determined to be so indicative of a high risk of recidivism that their presence should always result in a Level 3 classification: (1) torture or mutilation of the victim or the infliction of death, (2) abduction and forcible transportation of the victim to another location, (3) threats to reoffend sexually or violently, and (4) recent clinical assessment of dangerousness. 272 Neb. Admin. Code, ch. 19, § 012.05(A) through (D) (2000).

Under the NSP's rules and regulations, the aforementioned factors were to be incorporated into a risk assessment instrument. 272 Neb. Admin. Code, ch. 19, § 012.02 (2000). Thereafter, every offender in the registry was to be evaluated using the risk assessment instrument based upon all records and data available concerning the offender. *Id*. In order to develop a risk assessment instrument, the NSP collaborated with Mario Scalora, Ph.D., of the law-psychology program at the University of Nebraska-Lincoln. To determine what factors best correlate to sexual recidivism, Scalora and a group of researchers tracked 1,300 sex offenders who had either been released from incarceration or placed on community-based probation. Based on this research and a review of the relevant literature, Scalora crafted a risk assessment instrument which scores the risk of recidivism by examining 14 factors. This risk assessment instrument has been used by the NSP to classify every offender in the registry, including Slansky. See § 012.02.

The 14 factors or "Items" in the risk assessment instrument are as follows: (1) number of convictions for sex or sex-related offenses (including current offenses); (2) number of convictions for other offenses, besides traffic infractions; (3) other sex or sex-related charges not resulting in conviction; (4) age at arrest for first sex or sex-related conviction; (5) relationship of offender to victim; (6) prior sex offense in jurisdictions other than from the State of Nebraska; (7) victim's gender; (8) age of sex crime victim(s); (9) use of force (includes current and previous sexual assaults); (10) release environment; (11) disciplinary history while incarcerated; (12) treatment (considers incarceration, court-ordered, or postrelease); (13) mental and cognitive functioning; and (14) calculation of time elapsed from previous release from court-ordered confinement or supervision to arrest for felony or Class I or Class II misdemeanor(s) for which the offender was convicted or while under court-ordered conditions.

If a certain factor is present, the offender is assigned a distinct number of points. For example, in regard to item 1 (number of convictions for sex or sex-related offenses), if the offender has been convicted of one sex-related offense, he or she is assessed 0 points; if the offender has been convicted of two sex-related offenses, he or she is assessed 40 points; and if the offender has been convicted of three or more sex-related offenses, he or she is assessed 60 points. We note that the number of points assigned for each item depends on its correlation with recidivism; items with the highest statistical relationship with recidivism have relatively higher point values on the risk assessment instrument. Once all 14 items have been examined, the offender's score is totaled. If the offender scores below 70 points, he or she is considered a low risk and classified as a Level 1 offender. If the offender scores between 75 and 125 points, he or she is considered a moderate risk and classified as a Level 2 offender. If the offender scores 130 points or higher, he or she is considered a high risk and classified as a Level 3 offender.

We note that the risk assessment instrument, pursuant to § 012.05, includes a list of four factors which, if present, automatically, and regardless of the offender's overall score, results in the offender's being classified as a Level 3 offender. They are as follows: (1) victim tortured or acts resulted in death; (2) victim

abducted and forcibly transported to another location; (3) perpetrator articulates to officials or treatment professionals an unwillingness to control future sexually assaultive behavior or plans to reoffend violently or sexually; and (4) recent clinical assessment of dangerousness by a sex offender treatment or doctoral level professional asserting perpetrator presents a significant risk to reoffend. Conversely, the risk assessment instrument also contains two factors—debilitating illness and advanced age—which automatically result, regardless of the offender's overall score, in the offender's being classified as a Level 1 offender. In addition, the instrument allows the investigator conducting the assessment to depart from the presumptive risk category, if such departure is warranted. If a departure is granted, the investigator must explain the basis for the departure.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1985, at the age of 19, Slansky was charged with and convicted of, inter alia, the crimes of rape and attempted rape in Kansas. *State v. Slansky*, 239 Kan. 450, 720 P.2d 1054 (1986). As a result, Slansky was sentenced to a term of 15 to 20 years in prison. While incarcerated, Slansky refused to participate in mental health counseling and sex offender treatment because he thought it would have interfered with a number of his prison-time activities, including his work as an electrician within the prison.

On May 4, 1995, after serving approximately 10 years, Slansky was released from prison and placed on parole for the remaining 10 years of his sentence. Upon his release from prison, Slansky moved to Kearney, Nebraska. Pursuant to an interstate compact on parolees, Slansky signed a parole agreement with the State of Nebraska which required him to obtain counseling. After a number of sessions, this requirement was discontinued because Slansky's counselor, Anne Buettner, determined that he had readjusted to the community and did not pose a threat to public safety. On July 20, 1998, Slansky was discharged from parole.

On January 6, 2000, an investigator for the NSP completed the risk assessment instrument for Slansky. Slansky scored 150 points and was classified as a Level 3 sex offender. Thereafter, on March 17, the NSP sent Slansky a letter, notifying him that

the NSP Sex Offender Registry had determined he was at a high risk to reoffend sexually and that therefore, he had been classified as a Level 3 sex offender. The letter stated that a Level 3 classification requires the NSP to provide information concerning him to the public, appropriate law enforcement officials, schools, daycare centers, and youth and religious organizations, and that such notification would be done through news releases and other avenues as deemed appropriate. In addition, the letter notified Slansky that if he disagreed with the NSP's determination, he could request a hearing to contest his classification as a Level 3 offender. Five days later, Slansky gave notice of his intent to contest the classification and the grounds therefor.

Slansky's administrative hearing was held on August 28, 2002. Two days later, the hearing officer issued his decision recommending that the NSP's decision classifying Slansky as a Level 3 sex offender be upheld. The same day, the superintendent of the NSP issued an order adopting the recommended decision of the hearing officer in full and making it the final decision of the NSP.

On September 26, 2002, pursuant to the Administrative Procedure Act (APA), see Neb. Rev. Stat. § 84-901 et seq. (Reissue 1999 & Supp. 2003), Slansky filed a petition in the district court for Lancaster County appealing his classification as a Level 3 sex offender. See 272 Neb. Admin. Code, ch. 19, § 014.02 (2000). On May 29, 2003, the district court entered its order affirming the decision of the NSP. Slansky filed a timely notice of appeal, which we moved to our docket pursuant to our authority to regulate the caseloads of this court and the Nebraska Court of Appeals. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

### III. ASSIGNMENTS OF ERROR

Slansky assigns, restated, that the district court erred in affirming the NSP's decision to classify him as a Level 3 offender because (1) the NSP's decision is unsupported by the evidence and contrary to law; (2) the risk assessment instrument is invalid, flawed, and inaccurate as applied to him; (3) the risk instrument does not include a number of relevant mitigating factors; (4) the NSP failed to find that he had presented mitigating factors which justified a downward departure from his presumptive classification; (5) SORA violates the Ex Post

Facto Clause of the federal and state Constitutions; (6) SORA violates the constitutional prohibition against double jeopardy; (7) SORA violates his procedural and substantive due process rights, as well as his right to equal protection under the law; (8) the NSP's decision is based on speculation, guess, and conjecture; (9) SORA's release-of-information provision is overbroad and violates his due process rights; (10) the NSP's current practice of posting information concerning Level 3 sex offenders on its Web site is not authorized by SORA; and (11) SORA violates the constitutional prohibition against imposing cruel and unusual punishment.

## IV. STANDARD OF REVIEW

Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *State v. Worm, ante* p. 74, 680 N.W.2d 151 (2004). A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Id.*

A judgment or final order rendered by a district court in a judicial review pursuant to the APA may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Stejskal v. Department of Admin. Servs.*, 266 Neb. 346, 665 N.W.2d 576 (2003). When reviewing an order of a district court under the APA for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable. *Stejskal, supra.* Whether a decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court. *Id.* An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Id.*

## V. ANALYSIS

### 1. NSP's DECISION AND RISK ASSESSMENT INSTRUMENT

After being notified of his classification as a Level 3 offender, Slansky requested a hearing to challenge his classification level.

The hearing officer rejected Slansky's challenge and upheld Slansky's classification as a Level 3 offender. The NSP adopted the hearing officer's decision. On appeal to the district court, Slansky made a number of arguments concerning the NSP's decision and the risk assessment instrument. In upholding Slansky's classification as a Level 3 offender, the district court determined, inter alia, that the NSP's decision was based upon sufficient evidence and that Slansky's challenges to the risk assessment instrument were without merit.

On appeal to this court, Slansky's first through fourth and eighth assignments of error challenge the district court's decision to uphold the NSP's classification and the court's approval of the risk assessment instrument. These assignments of error, however, can be consolidated into three main arguments: (1) Slansky's score was unsupported by the evidence because it did not account for a number of mitigating factors; (2) to the extent the risk assessment instrument does not account for certain mitigating factors, it fails to accurately reflect an offender's true risk of recidivism; and (3) the risk assessment instrument is invalid, flawed, or inaccurate because it has "a rate of error of 12%." Brief for appellant at 44. Because the district court's decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable, we reject Slansky's arguments.

First, Slansky contends that his classification as a Level 3 offender is not supported by the evidence because it fails to account for a number of mitigating factors that he presented. We disagree.

As an initial matter, we note that Slansky did not contest his risk assessment score in regard to items 1 through 9, 11, 13, and 14. Therefore, the district court was presented with undisputed evidence establishing that Slansky had a risk assessment score of 150 points, or 20 points more than were needed to classify him as a Level 3 offender. Slansky did contest his score in regard to items 10 and 12; however, the record contains competent evidence to support the district court's decision to uphold the NSP's score for these two items.

In regard to item 10 (release environment), Slansky was assessed 10 points because he was not under supervision at the

time of the assessment. The evidence adduced at the hearing established that Slansky had been released from supervision more than 4 years prior to the hearing, and the district court's decision to affirm the assessment of 10 points is supported by competent evidence.

With respect to item 12 (treatment), Slansky was assessed 20 points because he did not participate in court-ordered or professionally recommended treatment. At the hearing, Slansky admitted to refusing to undergo sex offender treatment while incarcerated in Kansas. Upon his release from prison, Slansky attended counseling sessions with Buettner, who had been recommended to him by his parole officer.

At his prenotification hearing, Slansky argued that these counseling sessions were tantamount to professionally recommended treatment. However, his own expert witness, Sandra Hale Kroeker, a clinical social worker who specializes in sex offender treatment, testified that the counseling sessions with Buettner did not meet the requirements of sex offender specific treatment. Therefore, the effectiveness of the counseling sessions with Buettner were put into question and the district court's affirmance of the NSP's decision not to deviate from the instrument is supported by competent evidence and is not arbitrary, capricious, or unreasonable.

Slansky contends, however, that the hearing officer should have deviated from the presumptive classification because he presented a number of mitigating factors. For example, Slansky testified that since his release, he has been an emotionally stable, married man, with a small child and a good job. In addition, he notes that after his release, he completed counseling with Buettner, as required by his parole agreement, and that he had been unsupervised, without incident, for over 4 years. Moreover, Slansky contends that expert testimony established that certain life experiences, such as a number of those he experienced, reduce an offender's risk of recidivism.

As the district court noted, however, the record is not as conclusive as Slansky asserts. In fact, the clinical director of the NSP Sex Offender Registry, Shannon Black, Ph.D., testified that a number of these alleged mitigators have either unknown or unquantifiable effects, or bear adversely on an offender's risk of

recidivism. For example, Slansky argues that the fact that he has been unsupervised for over 4 years without incident shows that he is at a low risk to reoffend. Black testified, however, that offenders who are not under supervision, even if they have successfully completed a period of unsupervised release, are at a high risk to reoffend. Black's testimony was echoed by Kroeker, who stated that the risk of recidivism is higher for offenders who are unsupervised, including those who have successfully completed a period of supervision. Moreover, Black's and Kroeker's testimonies are supported by appendix C of the risk assessment manual, which notes that "[m]ultiple studies on recidivism and treatment using long-term follow-ups indicate that sexual offenders may continue to be at risk for recidivism for many years after release or supervision, possibly up to 20 . . . ."

Similarly, Slansky contends that numerous life experiences, such as marriage and child-rearing, decrease an offender's risk to reoffend. However, Black testified that for some offenders, marriage does not decrease their risk of reoffending. In addition, Black testified that these life experiences were not included in the instrument because they are too dynamic and affect individuals differently. Thus, although Slansky presented evidence of a number of positive life experiences, additional evidence concerning the unknown effect of such experiences leads us to conclude that the district court's affirmance of the NSP's decision not to depart from Slansky's presumptive classification is supported by the evidence and is not arbitrary, capricious, or unreasonable.

Second, Slansky contends that to the extent that the risk assessment instrument does not account for a number of life experiences and alleged mitigators, it does not accurately reflect a registrant's true risk of recidivism and, therefore, is contrary to the mandate of SORA. Again, Slansky focuses his challenge on items 10 and 12 of the instrument.

With regard to item 10 (release environment), Slansky argues that the instrument is invalid because item 10 does not account for the fact that he had not reoffended in the 4 years since his release from supervision. However, we again note that item 10 assigns 10 points for offenders who are no longer under supervision because they remain at a high risk to reoffend. Therefore, although Slansky's behavior during the 4 years after his release

from supervision is commendable, it does not provide a basis from which a downward departure in score must be made.

In regard to item 12 (treatment), Slansky argues that the instrument is invalid because it does not account for the fact that he received counseling while on parole. At his prenotification hearing, Slansky presented two witnesses who discussed the adequacy of his counseling sessions with Buettner. Buettner testified that her sessions with Slansky were the equivalent of a specific sex offender treatment program. Kroeker, however, questioned the utility of Slansky's sessions with Buettner and stated that Slansky still needed to undergo sex offender specific treatment. Therefore, Slansky's failure to receive a downward departure for attending counseling did not stem from the instrument's inability to grant such a departure, but, rather, from questions concerning the effectiveness of the counseling sessions.

Slansky also argues that the Legislature intended the instrument to contain more than two mitigating factors—debilitating illness and advanced age—which justify a downward departure in score. As Slansky notes, § 29-4013(2)(b)(i) and (ii) instructs the NSP to incorporate, as relevant factors, conditions of release that minimize the risk of recidivism, including probation, parole, counseling, therapy, or treatment, as well as advanced age and debilitating illness. See, also, § 012.03. Contrary to Slansky's suggestion, however, nothing in SORA mandates that points should be deducted from the score of an offender who has successfully completed treatment or is released on parole. Instead, SORA merely instructs the NSP to take these factors into account when determining an offender's risk of recidivism. Although Slansky may not be satisfied with the way the instrument accounts for these factors, it undoubtedly considers them in determining an offender's risk of recidivism.

Next, Slansky argues that the instrument should include a number of specific mitigating factors, in addition to those referenced above. This argument is without merit. As an initial matter, we note that the instrument allows an investigator to depart from the presumptive risk category so long as such departure is warranted by the facts and the investigator explains the basis for such departure. Moreover, in regard to including additional mitigating factors within the instrument itself, the Legislature

clearly delegated decisionmaking power concerning which additional factors, if any, should be included in the risk assessment instrument. See § 29-4013(2).

Third, Slansky contends that the risk assessment instrument is invalid, flawed, or inaccurate because it has a statistical error rate of 12 percent. The record indicates that the researchers who developed the risk assessment instrument tracked approximately 1,300 sexual offenders who had been either released from incarceration or placed on community-based probation. In order to determine what factors correlated with recidivism, the researchers compared a sample of 190 sex offenders who reoffended after release with a randomly selected sample of 315 offenders who were released during the same time period and did not reoffend. Black testified that the researchers ultimately narrowed the items to those that make up the current risk assessment instrument and that these 14 items correctly classified the statistical samples 88 percent of the time.

Relying on the instrument's statistical error rate, Slansky argues that the NSP's determination that he is at a high risk to reoffend is no better than a speculative guess. Slansky's contention is incorrect. As an initial matter, we note that the instrument's 88-percent validation rate is not tantamount to an admission that 12 percent of the offenders in the registry have been misclassified. Instead, 12 percent simply represents the rate at which the instrument erred in classifying the sample groups. Moreover, the 12-percent statistical error rate represents both over- and under-classifications. Thus, to the extent the instrument erred in classifying the sample offenders, it occasionally did so in favor of the offender.

Furthermore, it is important that we recognize that no instrument will perfectly predict future conduct. As stated elsewhere: "[T]he non-existence of a perfect predictor of recidivism should not preclude legislative resort to a rationally based instrument of risk assessment, developed and validated by mental health professionals." *E.B. v. Verniero*, 119 F.3d 1077, 1098 (3d Cir. 1997). In this regard, Black's testimony concerning the instrument establishes that it was carefully and rationally crafted. While acknowledging some of the instrument's shortcomings, Black testified that the instrument (1) is based on a significant

amount of empirical data, (2) utilizes factors that correlate with a registrant's risk of recidivism, (3) is valid and appropriate for its purpose, and (4) is consistent with other instruments that have been developed. Consequently, we conclude that the instrument is a rationally based risk assessment tool and that the grounds Slansky asserted to challenge the instrument are without merit.

## 2. RELEASE OF INFORMATION

At the time of Slansky's assessment, information obtained under SORA was to remain confidential except in three situations:

(1) Information shall be disclosed to law enforcement agencies for law enforcement purposes;

(2) Information may be disclosed to governmental agencies conducting confidential background checks; and

(3) The Nebraska State Patrol and any law enforcement agency authorized by the patrol shall release relevant information that is necessary to protect the public concerning a specific person required to register, except that the identity of a victim of an offense that requires registration shall not be released. Release of such information shall conform with the rules and regulations adopted and promulgated by the Nebraska State Patrol pursuant to section 29-4013.

§ 29-4009. As previously mentioned, whether it is necessary to notify the public under § 29-4009(3) is essentially a question whether the offender is at a high risk to reoffend. See § 29-4013. If the offender has been determined to be at a high risk of reoffending, "the public shall be notified through means designed to reach members of the public likely to encounter the sex offender, which are limited to direct contact, news releases, or a system utilizing a telephone system which charges a fee for each use." § 29-4013(2)(c)(iii).

On appeal, Slansky argues that the dissemination of his personal information via the NSP's Web site violates SORA because neither SORA nor the NSP's rules and regulations provide authority for the NSP to release sex offender information through the Internet. Moreover, Slansky claims that by posting information concerning Level 3 sex offenders on its Web site, thereby making such information available worldwide, the NSP is acting contrary to SORA's

requirement that "the public shall be notified through means designed to reach *members of the public likely to encounter* the sex offender." (Emphasis supplied.) § 29-4013(2)(c)(iii).

We conclude that SORA permits the NSP to post information concerning Level 3 offenders on its Web site. Under § 29-4013(c)(iii), the NSP is directed to notify the public about Level 3 offenders through "direct contact, news releases, or a system utilizing a telephone system which charges a fee for each use." *Id.* By posting information concerning Level 3 offenders on its Web site, the NSP is merely disseminating news releases through an alternative medium, i.e., the Internet. This does not violate SORA. Cf. § 29-4013(3) (stating that nothing in subsection (2) "shall be construed to prevent law enforcement officers from providing community notification concerning any person who poses a danger under circumstances that are not provided for in the act").

Likewise, the NSP, by posting information concerning Level 3 offenders on its Web site, is not acting contrary to § 29-4013(2)(c)(iii), which states that notice is to be limited to persons "likely to encounter" Level 3 offenders. Obviously, by posting information concerning Level 3 sex offenders on its Web site, the NSP greatly expands the number of people that can access information concerning persons that have been classified as Level 3 offenders. However, this fact is substantially mitigated by the reality that the farther away a person lives from Nebraska, the less likely it becomes that they will have an interest in accessing the information. See, *Femedeer v. Haun*, 227 F.3d 1244 (10th Cir. 2000); *Meadows v. Board of Parole*, 181 Or. App. 565, 47 P.3d 506 (2002).

In addition, the possibility that information concerning Level 3 offenders will end up in the public domain already exists under the more established methods of dissemination. For example, Slansky does not challenge the NSP's authority to disseminate press releases to the media, despite the fact that many media outlets, such as newspapers and television stations, operate Web sites on which they reproduce their newspaper or television reports. Furthermore, the NSP's Web site fulfills the regulatory purpose of SORA because it allows persons who wish to visit or move to certain areas of the state to take appropriate precautions.

See, *A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206 (3d Cir. 2003) (noting Internet registry protects persons planning to move to or vacation in state by allowing them access to location of high-risk offenders); *Com. v. Williams*, 574 Pa. 487, 832 A.2d 962 (2003). In sum, by posting information concerning Level 3 offenders on its Web site, the NSP is not impermissibly exceeding SORA's notice restriction.

### 3. EX POST FACTO CLAUSE

█ Slansky argues that SORA violates the Ex Post Facto Clause of the U.S. Constitution and the Nebraska Constitution. Both U.S. Const. art. I, § 10, cl. 1, and Neb. Const. art. I, § 16, provide that no ex post facto law shall be passed. Although Slansky challenges SORA under both constitutional provisions, we will undertake only a single analysis because this court ordinarily construes Nebraska's ex post facto clause to provide no greater protections than those guaranteed by the federal Constitution. See, *State v. Worm, ante* p. 74, 680 N.W.2d 151 (2004); *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999).

█ Essentially, Slansky argues that SORA's registration and notification provisions violate the Ex Post Facto Clause because he was sentenced in 1985, prior to the operative date of SORA. In support of his argument, Slansky points to our oft-repeated rule that "[a] law which purports to apply to events that occurred before the law's enactment, and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed, is an ex post facto law and will not be endorsed by the courts." *State v. Gales*, 265 Neb. 598, 633, 658 N.W.2d 604, 629 (2003). Accord, *State v. Gray*, 259 Neb. 897, 612 N.W.2d 507 (2000); *Urbano, supra*. However, the applicability of this rule depends on whether SORA operates as punishment. Stated otherwise, under the Ex Post Facto Clause, the retroactive application of civil disabilities and sanctions is permitted; only retroactive criminal punishment for past acts is prohibited. *Worm, supra*, citing *Doe v. Pataki*, 120 F.3d 1263 (2d Cir. 1997); *E.B. v. Verniero*, 119 F.3d 1077 (3d Cir. 1997); and *State v. Howell*, 254 Neb. 247, 575 N.W.2d 861 (1998).

Recently, in *Smith.v. Doe*, 538 U.S. 84, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), the U.S. Supreme Court upheld a similar

sex offender registration statute against an ex post facto challenge. In *Smith*, the court stated that a two-step "intent-effects" test should be used to analyze whether a law constitutes retroactive punishment in violation of the Ex Post Facto Clause. See *Worm, supra.*

> If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' "

*Smith*, 538 U.S. at 92.

Thus, we must first determine whether the intent of the Legislature in enacting SORA was to establish a nonpunitive civil regulatory scheme for sex offenders. See *Smith, supra.* If so, we must then determine whether SORA is so punitive in nature as to negate the Legislature's intent to deem it civil. *Smith, supra.*

We have recently rejected a similar ex post facto challenge to SORA. See *Worm, supra.* In *Worm*, the appellant, James R. Worm, appealed his sentence for attempted first degree sexual assault on a child and the district court's finding that he was subject to SORA. Faced with an ex post facto challenge to the registration requirements of SORA, we turned to the two-part intent-effects test announced in *Smith*, concluding that (1) the Legislature, in enacting SORA, intended to establish a civil regulatory scheme to protect the public from the danger posed by sex offenders and (2) the effect of SORA was not so punitive in nature as to negate the Legislature's intent.

Our decision in *State v. Worm, ante* p. 74, 680 N.W.2d 151 (2004), however, dealt only with a challenge to SORA's registration requirements. Here, Slansky's appeal presents a different ex post facto challenge to SORA because he argues that both the registration and notification provisions violate the Ex Post Facto Clause. Therefore, although we are guided by our analysis in *Worm*, it is necessary to analyze SORA's notification provisions.

### (a) Legislative Intent

In *Worm, supra*, we determined that the Legislature, in enacting SORA, intended to establish a civil regulatory scheme to

protect the public from the danger posed by sex offenders. Because we conclude that Slansky's arguments to the contrary are without merit, we reaffirm our determination in *Worm*.

On appeal, Slansky contends that the Legislature intended SORA to be criminal punishment because SORA has been placed in chapter 29, the "criminal procedure" chapter, of the Nebraska Revised Statutes. We disagree. As the U.S. Supreme Court has noted, although the manner of codification is probative of legislative intent, the "location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one." *Smith v. Doe*, 538 U.S. 84, 94, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) (determining that Alaska's sex offender registration statute's provisions were nonpunitive despite being codified in state's criminal procedure code). Here, a review of chapter 29 illustrates that it "contains many provisions that do not involve criminal punishment." See *Smith*, 538 U.S. at 95. For example, chapter 29 contains provisions relating to the testing of persons convicted of certain crimes for the human immunodeficiency virus, Neb. Rev. Stat. § 29-2290 (Cum. Supp. 2002); record keeping of criminal histories, Neb. Rev. Stat. § 29-3501 et seq. (Reissue 1995 & Supp. 2003); and state support for funding the defense of indigent defendants, Neb. Rev. Stat. § 29-3919 et seq. (Reissue 1995, Cum. Supp. 2002 & Supp. 2003). And "[a]lthough . . . these provisions relate to criminal administration, they are not in themselves punitive." *Smith*, 538 U.S. at 95. Therefore, the codification of SORA in Nebraska's criminal procedure code, by itself, is insufficient to support a conclusion that the Legislature's intent was punitive. See, *Smith, supra*; *State v. White*, 162 N.C. App. 183, 590 S.E.2d 448 (2004).

Slansky also contends that the Legislature evinced an intent for SORA to be criminal punishment because the Legislature found that the "efforts of law enforcement agencies to protect their communities, conduct investigations, and quickly apprehend sex offenders are impaired by the lack of available information" concerning sex offenders "who live, work, or attend school in their jurisdiction." § 29-4002. According to Slansky, this legislative finding shows that SORA was intended to aid criminal enforcement rather than the civil administration of sex offenders.

We rejected this argument in *State v. Worm, ante* p. 74, 83, 680 N.W.2d 151, 160 (2004):

> Worm, however, argues that assisting law enforcement agencies with future investigations and prosecutions evidences a punitive purpose in enacting the law. But assisting future law enforcement efforts by monitoring an offender's whereabouts does not inflict punishment and furthers the legitimate goal of protecting the public and preventing crime.

In sum, like the overwhelming majority of courts that have examined similar sex offender registration statutes, we conclude that in enacting SORA, the Legislature intended to create a civil, nonpunitive regulatory scheme. See, e.g., *Smith, supra*; *Hatton v. Bonner*, 356 F.3d 955 (9th Cir. 2004); *Femedeer v. Haun*, 227 F.3d 1244 (10th Cir. 2000); *Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999); *Doe v. Pataki*, 120 F.3d 1263 (2d Cir. 1997); *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir. 1997); *Com. v. Williams*, 574 Pa. 487, 832 A.2d 962 (2003); *Haislop v. Edgell*, 593 S.E.2d 839 (W. Va. 2003); *State v. Mount*, 317 Mont. 481, 78 P.3d 829 (2003); *State v. Kelly*, 256 Conn. 23, 770 A.2d 908 (2001); *People v. Malchow*, 193 Ill. 2d 413, 739 N.E.2d 433, 250 Ill. Dec. 670 (2000); *Meinders v. Weber*, 604 N.W.2d 248 (S.D. 2000); *State v. Bollig*, 232 Wis. 2d 561, 605 N.W.2d 199 (2000); *Kellar v. Fayetteville Police Dept.*, 339 Ark. 274, 5 S.W.3d 402 (1999); *State v. Cook*, 83 Ohio St. 3d 404, 700 N.E.2d 570 (1998).

### (b) Effects of SORA

Because we have determined that the Legislature intended SORA to be civil in nature, its intent will be rejected only if Slansky provides the clearest proof that SORA's notification provisions are so punitive in either purpose or effect as to negate the Legislature's intent. See *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) ("[b]ecause we 'ordinarily defer to the legislature's stated intent,' . . . ' "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty' "). See, also, *Worm, supra*, quoting in part *State v. Isham*, 261 Neb. 690, 625 N.W.2d 511 (2001).

In making this determination, we consider the factors first set forth by the U.S. Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963). See *Worm, supra*. They are as follows:

> "(1) '[w]hether the sanction involves an affirmative disability or restraint'; (2) 'whether it has historically been regarded as a punishment'; (3) 'whether it comes into play only on a finding of *scienter*'; (4) 'whether its operation will promote the traditional aims of punishment—retribution and deterrence'; (5) 'whether the behavior to which it applies is already a crime'; (6) 'whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) 'whether it appears excessive in relation to the alternative purpose assigned.' "

*Isham*, 261 Neb. at 695, 625 N.W.2d at 515-16, quoting *Hudson v. United States*, 522 U.S. 93, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997). Although "neither exhaustive nor dispositive," this list of factors provides a helpful starting point from which to determine whether a civil regulatory scheme "provide[s] for sanctions so punitive as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty.' " *United States v. Ward*, 448 U.S. 242, 249, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980).

Ignoring the *Mendoza-Martinez* factors, Slansky sets forth two arguments as to why the effects of SORA are so punitive as to negate the Legislature's intent. First, Slansky argues that the potential release of his status as a sex offender will cause him and his family great emotional stress, and could adversely impact his and his wife's employment situations. Second, Slansky contends that by providing unlimited access to his information via its Web site, the NSP is simply compounding the aforementioned repercussions of community notification.

As an initial matter, it is obvious that community notification can have adverse effects on an offender's life. See, *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir. 1997); *E.B. v. Verniero*, 119 F.3d 1077, 1102 (3d Cir. 1997) ("[t]here can be no doubt that the indirect effects of . . . notification on the registrants involved and their families are harsh"). However, "whether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry the 'sting of punishment.' "

*Department of Revenue of Mont. v. Kurth Ranch,* 511 U.S. 767, 777 n.14, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994).

Here, although SORA's notification provisions may be the "but for" cause of some of the effects Slansky complains of, these effects are not consequences that SORA contemplates or condones, and are the result of independent actions by private third parties. See *Doe v. Pataki,* 120 F.3d 1263 (2d Cir. 1997). See, also, *Cutshall v. Sundquist,* 193 F.3d 466 (6th Cir. 1999) (noting that burdens on sex offenders do not stem from notification, but from abuse of registry by public); *Verniero, supra.* In fact, the risk of emotional stress and other adverse effects stem "essentially from the fact of the underlying conviction." *Pataki,* 120 F.3d at 1280. See, also, *Smith v. Doe,* 538 U.S. 84, 101, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) ("consequences flow not from [a sex offender registration act's] registration and dissemination provisions, but from the fact of conviction"); *Verniero, supra.*

Furthermore, although the "[d]issemination of . . . criminal activity has always held the potential for substantial negative consequences for those involved in that activity," "[d]issemination of such information . . . has never been regarded as punishment when done in furtherance of a legitimate governmental interest." *Verniero,* 119 F.3d at 1099-1100. See, also, *Hyatt v. Com.,* 72 S.W.3d 566 (Ky. 2002). Similarly, we note that much of the information that subjects offenders to these alleged burdens is already in the public realm. See, *Smith, supra; Pataki, supra; Verniero, supra.*

In addition, it is important to recognize that public notification serves one of the fundamental purposes behind SORA; it allows persons who have been notified to take action to protect themselves and their families. See, § 29-4002; *Pataki, supra.* As the U.S. Supreme Court stated: "The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." *Smith,* 538 U.S. at 99. Therefore, although the burdens that offenders incur as a result of notification are unwelcome to the offender, they are not so excessive as to exceed SORA's

remedial purpose. See *State v. Bollig*, 232 Wis. 2d 561, 605 N.W.2d 199 (2000).

Moreover, although we recognize that the NSP's Web site may compound the adverse effects experienced by Slansky, we conclude that its effects are limited and not so punitive as to negate the Legislature's intent to enact a civil regulatory scheme. In this regard, we find the recent analysis by the U.S. Supreme Court to be persuasive:

> The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to the extent of the publicity. And the geographic reach of the Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. . . .
>
> . . . .
>
> . . . Given the general mobility of our population, for Alaska to make its registry system available and easily accessible throughout the State was not so excessive a regulatory requirement as to become a punishment.

*Smith v. Doe*, 538 U.S. 84, 99-105, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003). See, also, *Haislop v. Edgell*, 593 S.E.2d 839 (W. Va. 2003); *State v. Mount*, 317 Mont. 481, 78 P.3d 829 (2003). Slansky's ex post facto challenge is without merit.

### 4. DOUBLE JEOPARDY

Slansky argues that SORA punishes him twice for the same offense in violation of the Double Jeopardy Clause of the U.S. Constitution. U.S. Const. amend. V. In the past, we have recognized that the intent-effects test applies to both double jeopardy and ex post facto challenges to a statutory scheme. *State v. Schneider*, 263 Neb. 318, 640 N.W.2d 8 (2002). In light of our ex post facto analysis, we conclude that SORA merely constitutes a nonpunitive civil regulatory scheme. Therefore, because SORA does not impose punishment, the Double Jeopardy Clause is not implicated, and Slansky's assignment of error is without merit.

## 5. DUE PROCESS

### (a) Procedural Due Process

Next, Slansky argues that the public disclosure of information concerning his status as a sex offender violates his right to procedural due process. See, U.S. Const. amend. XIV, § 1; Neb. Const. art. I, § 3. Specifically, Slansky argues that SORA infringes upon his right to privacy without providing him sufficient due process.

 Procedural due process limits the government's ability to deprive people of interests which constitute "liberty" or "property" interests within the meaning of the Due Process Clause. Due process requires that parties deprived of such interests be provided adequate notice and an opportunity to be heard. *State v. Worm, ante* p. 74, 680 N.W.2d 151 (2004). When an individual claims he or she is being deprived of a liberty interest without due process, the claim is examined in three stages. First, a determination must be made that there is a liberty interest at stake. In the second stage, the court must determine what procedural safeguards are required. Finally, the facts of the case are examined to ascertain whether there was a denial of that process which was due. *Benitez v. Rasmussen*, 261 Neb. 806, 626 N.W.2d 209 (2001).

Although Slansky asks us to recognize that he has a constitutional right to keep his registry information private, we need not reach this issue because even if we assume Slansky has a liberty interest in not having such information released, the process afforded to him before public dissemination was surely adequate.

 This court has stated that due process does not guarantee an individual any particular form of state procedure. *Boll v. Department of Revenue*, 247 Neb. 473, 528 N.W.2d 300 (1995). Instead, the requirements of due process are satisfied if a person has reasonable notice and an opportunity to be heard appropriate to the nature of the proceeding and the character of the rights which might be affected by it. *Holste v. Burlington Northern RR. Co.*, 256 Neb. 713, 592 N.W.2d 894 (1999).

Under SORA, the NSP was charged with adopting and promulgating rules and regulations concerning community notification. See § 29-4013(2)(a) through (d). Pursuant to the rules and regulations adopted by the NSP, persons required to register

under SORA are to be notified of their classification as a Level 1, 2, or 3 offender by registered mail or personal contact. 272 Neb. Admin. Code, ch. 19, § 014.01 (2000). Once contacted, registrants then have 5 working days in which to notify the Sex Offender Registration Program that they wish to contest the classification level assigned by the NSP. *Id.* If a hearing is requested, it is to be held pursuant to the APA and the Nebraska State Patrol rules and regulations pertaining to administrative hearings. § 014.02. After the hearing, a decision is to be rendered by the hearing officer within 10 days. *Id.* Appeals from that decision are to be filed in Lancaster County District Court in accordance with the APA. *Id.* Community notification is prohibited until after the hearing, and all subsequent appeals are final. See 272 Neb. Admin. Code, ch. 19, § 014.03 (2000).

In the instant case, Slansky received a letter from the NSP that notified him of (1) his classification as a Level 3 sex offender, (2) SORA's public notification provisions for Level 3 offenders, and (3) his ability to contest his classification as a Level 3 offender prior to public disclosure. Furthermore, we note that Slansky had the opportunity to conduct discovery prior to his hearing and the right of compulsory process. Moreover, Slansky was represented by counsel at the hearing, who put on evidence in favor of Slansky and cross-examined the NSP's witnesses. Clearly, Slansky was afforded notice and a meaningful opportunity to contest the NSP's decision.

Nonetheless, Slansky argues that his prenotification review hearing was illusory and constituted insufficient process because (1) he was not allowed to challenge the psychological basis of the classification instrument, (2) the burden of proving his classification as a Level 3 offender should have been on the State, (3) he was not allowed to challenge the NSP's definition of persons "likely to encounter" him, and (4) he was not allowed to challenge the NSP's use of the Internet as a medium for dispensing information concerning Level 3 sex offenders.

Slansky's first argument is without merit because it is based on inaccurate facts. As Slansky contends, the original scope of a prenotification review hearing was limited to a review of the accuracy of the information used in making the classification assessment, and persons challenging their classification level

were not allowed to challenge the psychological basis of the classification instrument. See § 014.02. However, prior to Slansky's hearing, this rule was changed. Cf. 272 Neb. Admin. Code, ch. 19, § 015.02C (2004). In fact, not only did Slansky receive notice of his ability to challenge the risk assessment instrument, he acknowledged this change by giving notice of his intent to challenge the instrument. Moreover, Slansky did in fact challenge the instrument at his hearing.

Next, Slansky contends that the NSP had the initial burden of proving he should have been classified as a Level 3 offender. Assuming, arguendo, that this is true, Slansky did not contest his risk assessment score in regard to items 1 through 9, 11, 13, and 14. Consequently, the hearing officer was presented with undisputed evidence establishing that Slansky had a risk assessment score of 150 points, or 20 points more than were needed to classify him as a Level 3 offender, and the NSP produced sufficient evidence to support its proposed classification.

In regard to his two remaining arguments, Slansky fails to recognize the limited nature of an administrative hearing. As a general rule, administrative agencies have no general judicial powers, notwithstanding that they may perform some quasi-judicial duties. *Stoneman v. United Neb. Bank*, 254 Neb. 477, 577 N.W.2d 271 (1998). Here, under the rules and regulations adopted pursuant to SORA, registrants such as Slansky are granted a limited review hearing to contest their classification. Importantly, these hearings are limited to the appropriateness of a registrant's classification; they do not provide a forum to challenge the consequences of that classification. See 272 Neb. Admin. Code, ch. 19, § 014 (2000). The hearing officer was without the authority to question the NSP's authority to disseminate information concerning Level 3 offenders or to challenge the NSP's interpretation of the statutory phrase "likely to encounter." See *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994) (administrative body has no power or authority other than that specifically conferred by statute or by construction necessary to accomplish plain purpose of act).

This is not to say, however, that these issues are not appropriate for review. Rather, Slansky, as he did with his other constitutional objections to SORA, was entitled to make these arguments

for the first time before the district court. See *In re Applications A-16027 et al.*, 242 Neb. 315, 495 N.W.2d 23 (1993), *modified* 243 Neb. 419, 499 N.W.2d 548.

### (b) Substantive Due Process

In *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990), the U.S. Supreme Court held that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment. Therefore, according to Slansky, the risk assessment instrument, by adding 20 points to his sex offender classification score for failing to complete sex offender treatment while incarcerated, infringes upon his fundamental right to refuse medical treatment.

The record illustrates that while incarcerated in Kansas, Slansky refused to participate in mental health counseling and sex offender treatment because he felt it would have interfered with a number of his prison-time activities. Contrary to Slansky's assertion, however, the risk assessment instrument, by taking note of the fact that he did not undergo treatment, did not punish him for his choice. Rather, the instrument merely accounted for the absence of such treatment in determining whether he is at a risk to reoffend. Therefore, SORA does not implicate Slansky's right to refuse medical treatment, and this assignment of error is without merit.

### 6. EQUAL PROTECTION

Next, Slansky contends that SORA violates his right to equal protection under the law. See, U.S. Const. amend. XIV, § 1; Neb. Const. art. I, § 3. Although somewhat unclear, Slansky appears to argue that if he had remained in Kansas until he was discharged from parole in 1998, he would not have been required to register under SORA. Therefore, according to Slansky, SORA treats out-of-state offenders who move to Nebraska prior to the completion of their sentence differently from out-of-state offenders who move to Nebraska after the completion of their sentence.

Slansky's argument is without merit. Under SORA, it is utterly irrelevant that Slansky was discharged from parole in Nebraska, rather than Kansas. See § 29-4003(1). Slansky was required to register as a sex offender because he had been convicted of a registrable sex offense and moved to Nebraska.

See § 29-4003(1)(b). Therefore, even if, as Slansky's hypothetical suggests, he had remained in Kansas until he was discharged from parole in 1998, he would have still been subject to SORA's registration requirements upon his arrival in Nebraska. *Id.*

### 7. Cruel and Unusual Punishment

In his final assignment of error, Slansky contends that SORA violates the Eighth Amendment's prohibition against cruel and unusual punishment. Slansky's "argument" in this regard, however, merely consists of a reformulation of the assigned error and, therefore, does not constitute the required argument in support of the assigned error. See *State ex rel. City of Alma v. Furnas Cty. Farms*, 266 Neb. 558, 667 N.W.2d 512 (2003).

### VI. CONCLUSION

For the foregoing reasons, we conclude that Slansky's challenges to SORA, the risk assessment instrument, and the NSP's classification determination are without merit. The judgment of the district court was correct in all respects and is affirmed.

AFFIRMED.

WRIGHT, J., not participating.