762 N.W.2d 305 (2009)
277 Neb. 362
In re INTEREST OF J.R., alleged to be a dangerous sex offender.
J.R., Appellant,
v.
Mental Health Board of the Fourth Judicial District, Appellee.
No. S-07-1300.
Supreme Court of Nebraska.
March 13, 2009.
*312 Thomas C. Riley, Douglas County Public Defender and Sean M. Conway, for appellant.
Jeffrey J. Lux, Deputy Douglas County Attorney and Michael W. Jensen, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

I. NATURE OF CASE
J.R. challenges the constitutionality of the Sex Offender Commitment Act (SOCA)[1] as a violation of equal protection and double jeopardy, and as an impermissible ex post facto law under the U.S. Constitution and the Nebraska Constitution. J.R. also challenges the sufficiency of the evidence supporting the decisions of the Mental Health Board of the Fourth Judicial District (the Board) and the district court adjudging him to be a dangerous sex offender in need of involuntary, inpatient treatment under SOCA.

II. BACKGROUND
On October 3, 2000, J.R. was convicted of first degree sexual assault on a child for sexually assaulting his girlfriend's daughter. The sexual assaults occurred over a period of years, starting when the child was in the second grade. The assaults continued until the seventh grade and progressed from fondling to sexual intercourse. Two months before being charged, J.R. sought psychotherapy because he "knew that he had a problem." But J.R. was unable to complete his recommended treatment before being sentenced to 10 to 12 years' imprisonment for the assaults.
While in prison, J.R. participated in an inpatient sex-offender program from May 2001 to December 2002. J.R. did not complete this treatment, however, because he was terminated from the program for unsatisfactory progress and an unrelated laundry violation. J.R. did complete other behavior management groups while in prison.
J.R. was scheduled for discharge from prison on December 12, 2006. On November 6, the deputy county attorney (the State) filed a petition with the Board seeking to have J.R. adjudged to be a dangerous sex offender as defined by Neb.Rev. Stat. § 83-174.01(1)(a) (Cum.Supp.2008) and, accordingly, to have him placed in the custody of the Department of Health and Human Services for further treatment.
The Board held a hearing on January 9, 2007. The Board found by clear and convincing evidence that J.R. was a mentally ill, dangerous sex offender likely to reoffend and that inpatient treatment through the Department of Health and Human Services was the least restrictive treatment plan.
At the hearing, the State entered into evidence testimony from Dr. Stephen Skulsky, a licensed and certified clinical psychologist who evaluated J.R. on November 20, 2006. As part of J.R.'s evaluation, Skulsky obtained information about J.R.'s history. Specifically, he reviewed a letter from the Douglas County Attorney's office summarizing J.R.'s situation and an incident report regarding the sexual abuse. Skulsky also reviewed a letter from Dr. *313 Mark Weilage, a clinical psychologist at the Department of Correctional Services.
Weilage evaluated J.R. in 2006. His letter contained the results of a "Static-99" measure, a test customarily used in commitment proceedings to assist clinicians in forming an opinion as to the level of risk that an offender will reoffend. J.R. scored a zero, the lowest score on the Static-99 measure, demonstrating a low risk for reoffending. Weilage opined, however, that the Static-99 measure may underestimate J.R.'s risk for reoffending. Weilage further noted that the treatment staff still had concerns about J.R.'s unmet treatment needs. Nevertheless, it was Weilage's opinion that there was insufficient evidence in J.R.'s file to indicate that he would meet the criteria of a dangerous sex offender.
J.R. asserted that previous evaluations had been conducted, but such evaluations were not included in the record. Skulsky did not consider these other evaluations because he was not aware of them. Skulsky indicated that he had also evaluated J.R. in 2000, but that he did not use that evaluation because of an issue regarding payment. Skulsky's previous evaluation was also not introduced into evidence.
In addition to the documents already listed, Skulsky conducted an in-person evaluation of J.R. and administered various personality tests, including the "Minnesota Multi-Phasic Personality Inventory-Form 2"; the Rorschach, or inkblot test; the "Thematic Apperception" test; projective drawings; and an "Incomplete Sentences Blank." Skulsky noted that J.R.'s history included emotional, physical, and sexual abuse by his stepfather, substance abuse, and inappropriate sexual behaviors for which he was incarcerated. J.R. and Skulsky also discussed the 18 months of sex offender treatment J.R. received in prison. Skulsky testified that J.R. wanted treatment and that J.R. was disappointed that he did not have the opportunity to complete treatment while in prison. J.R. indicated he was willing to obtain treatment after being released from prison.
According to Skulsky, the test results revealed that J.R. is egocentric and irresponsible. The tests also revealed that J.R. is an "arousal seeker" and has problems controlling his emotions and his sexual urges. Skulsky diagnosed J.R., to a reasonable degree of psychological certainty, with (1) dysthymic disorder, (2) personality disorder "NOS," (3) cannabis or marijuana dependence, and (4) pedophilia. Skulsky explained that despite the fact that J.R. had a "good understanding of what had happened," J.R. was still a pedophile. Skulsky testified that without successfully completing treatment, J.R. would have a hard time clearly perceiving things and would be likely to recidivate.
Skulsky recommended 6 months of involuntary, inpatient treatment to finish the sex offender program. Skulsky concluded that this was the least restrictive treatment alternative "[b]ecause of the possible negative outcome given the dangerousness of his likely repeating the offense, it's too great a risk to run for the safety of society based on my professional opinion. That's why, the fact that he's still dangerous."
Based on this evidence, the Board found J.R. to be a dangerous sex offender under § 83-174.01(1)(a) and committed him to secure inpatient treatment. The district court affirmed. We granted J.R.'s petition to bypass the Nebraska Court of Appeals.

III. ASSIGNMENTS OF ERROR
J.R. asserts, renumbered and restated, three assignments of error. First, J.R. asserts that SOCA is unconstitutional under the U.S. Constitution and the Nebraska *314 Constitution, because (1) it constitutes an impermissible ex post facto law, (2) it violates double jeopardy, and (3) it violates equal protection. Second, J.R. asserts that the Board erred in finding that J.R. is a dangerous sex offender. Third, J.R. asserts that the Board erred in finding that neither voluntary hospitalization nor other treatment alternatives less restrictive were available as required by § 71-1209.

IV. STANDARD OF REVIEW
Whether a statute is constitutional is a question of law; accordingly, we are obligated to reach a conclusion independent of the decision reached by the court below.[2] A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality.[3] All reasonable intendments must be indulged to support the constitutionality of legislative acts, including classifications adopted by the Legislature.[4]
The district court reviews the determination of a mental health board de novo on the record.[5] In reviewing a district court's judgment, we will affirm the judgment unless we find, as a matter of law, that the judgment is not supported by clear and convincing evidence.[6]

V. ANALYSIS
This is the first time we have considered constitutional challenges under SOCA. As such, we begin our analysis with a brief overview of SOCA.
In 2006, the Nebraska Legislature enacted SOCA.[7] The purpose of SOCA "is to provide for the court-ordered treatment of sex offenders who have completed their sentences but continue to pose a threat of harm to others."[8] SOCA provides a separate legal standard for sex offenders, which allows dangerous sex offenders to meet the standards of a mentally ill, dangerous sex offender who would not meet the traditional standards of mentally ill and dangerous under the Nebraska Mental Health Commitment Act (MHCA).[9]
Section 71-1203 provides that the definition of a dangerous sex offender under SOCA is found in § 83-174.01. A dangerous sex offender is
(a) a person who suffers from a mental illness which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his or her criminal behavior or (b) a person with a personality disorder which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of two or more sex offenses, and who is substantially unable to control his or her criminal behavior.[10]
In other words, the civil commitment procedures of SOCA apply to presently confined *315 persons who, like J.R., have been convicted of one or more sex offenses and are scheduled for release.
Under SOCA, the Board must hold a hearing to determine whether there is clear and convincing evidence that the subject is a dangerous sex offender.[11] But before the hearing, a law enforcement officer who has probable cause to believe the subject is a dangerous sex offender who is likely to reoffend before the Board proceedings may place the subject in emergency protective custody or have the subject continue his or her custody if already in custody.[12] While other "mentally ill and dangerous" persons held in emergency protective custody are held in "an appropriate and available medical facility"[13] if there is probable cause to conclude they are a danger while awaiting the hearing, any mentally ill subject who has a prior conviction for a sex offense, shall be admitted to a jail or correctional facility. A mentally ill subject with a prior conviction for a sex offense will only be held in a medical facility if a "medical or psychiatric emergency exists for which treatment at a medical facility is required" and, in such a case, the subject is to remain in the medical facility only "until the medical or psychiatric emergency has passed and it is safe to transport such person" to the jail or correctional facility.[14] All persons admitted into emergency protective custody must be evaluated within 36 hours after admission by a mental health professional.[15] The subject must then be released pending his or her hearing before the Board unless the mental health professional "determines, in his or her clinical opinion, that such person is mentally ill and dangerous or a dangerous sex offender."[16]
At the hearing, the State must prove by clear and convincing evidence that the subject is a dangerous sex offender and that neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by the Board are available or would suffice to prevent the harm described in § 83-174.01(1).[17]
After the hearing by the Board but before the entry of the Board's treatment order, the subject may either be retained in custody until the entry of the order or released from custody under conditions set forth by the Board.[18] If retained in custody, SOCA requires the subject be retained "at an appropriate and available medical facility, jail, or Department of Correctional Services facility."[19]
Once committed, the Board must designate a person to prepare and oversee the confined subject's individualized treatment plan.[20] Such person must submit periodic reports of the confined subject's progress and any modifications to the treatment plan to the Board.[21] If it is determined that the subject is no longer dangerous, immediate release is mandated.[22]

1. Ex POST FACTO
We first address J.R.'s argument that SOCA violates the Ex Post Facto *316 Clauses of the U.S. Constitution and the Nebraska Constitution. An ex post facto law disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed.[23] Essentially, J.R. argues that SOCA is unconstitutional because it is punitive in nature and retroactive in its application. SOCA had not yet been enacted when J.R. committed his sexual offenses for which he was incarcerated. The State asserts that retroactive application of SOCA does not violate the Ex Post Facto Clauses, because SOCA is not penal in nature and is instead a civil regulatory scheme.
Although J.R. challenges SOCA under both constitutional provisions, we will undertake a single analysis, because this court ordinarily construes Nebraska's ex post facto clause to provide no greater protections than those guaranteed by the federal Constitution.[24] Both U.S. Const. art. I, § 10, and Neb.Const. art. I, § 16, provide that no ex post facto law may be passed. A law which purports to apply to events that occurred before the law's enactment, and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed is an ex post facto law and will not be endorsed by the courts.[25] However, only retroactive criminal punishment for past acts is prohibited.[26] Civil disabilities and sanctions may apply retroactively without violating the Ex Post Facto Clauses.[27] We conclude that SOCA does not violate the Ex Post Facto Clauses.
It should be noted that other courts have held that statutes similar to SOCA that provide for the commitment of dangerous sex offenders preceding or following a criminal conviction do not violate ex post facto or double jeopardy principles.[28] This is because the commitment proceedings for dangerous sex offenders are nonpunitive and civil in nature.[29]
Whether SOCA violates state and federal constitutional protections against retroactive punishment is analyzed under the U.S. Supreme Court's two-prong "intent-effects" test for analyzing punishment.[30] Under the intent-effects test, we first determine whether the Legislature intended a statutory scheme to be civil. If so, that intent will be rejected only where the challenger provides the clearest proof that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention.[31] In analyzing whether the purpose or effect of SOCA is so punitive as to negate the Legislature's intent, we consider the following factors: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; *317 (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishmentretribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.[32]
Recently, in Kansas v. Hendricks,[33] the U.S. Supreme Court upheld a sex offender commitment statute very similar to SOCA against both an ex post facto and a double jeopardy challenge. We conclude that the Court's conclusion in Hendricks is controlling. Thus, we discuss the Court's reasoning in further detail.
The first question considered by the Court in Hendricks was whether the Kansas Legislature intended the Sexually Violent Predator Act (Kansas Act) to impose civil sanctions. If the legislature intended the Kansas Act to impose civil sanctions, the Court "ordinarily defer[s] to the legislature's stated intent."[34] The Court explained:
Although we recognize that a "civil label is not always dispositive," . . . we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil[.]"[35]
Because the Kansas Act is described as a "`civil commitment procedure,'" and is located in the Kansas probate code instead of the criminal code, the Court concluded that the legislature intended the Kansas Act to be civil in nature.[36]
The Court found that the Kansas Act was intended to be civil in nature. The Court went on to consider whether the defendant provided the clearest proof that the effects of the Kansas Act were so punitive as to negate the legislature's intention.[37] The Court concluded that the defendant failed to meet his burden of proof.[38]
In so concluding, the Court first noted that the Kansas Act did not implicate either retributive or deterrent objectives.[39] Even though the Kansas Act is triggered by the commission of a sexual assault, the Court found the Kansas Act was not retributive "because it does not affix culpability for prior criminal conduct. Instead, such conduct is used solely for evidentiary purposes, either to demonstrate that a `mental abnormality' exists or to support a finding of future dangerousness."[40]
Although the Kansas Act is triggered by the commission of a sexual assault, the Kansas Act does not make a criminal conviction a prerequisite for commitment.[41] Rather, the Kansas Act provides that commitment proceedings may be initiated only when a person "has been convicted of or charged with a sexually violent offense," *318 and "suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence."[42] The Court concluded that the absence of necessary criminal responsibility implies that the state was not trying to impose a punishment for past misdeeds.[43] And unlike a criminal statute, the Kansas Act does not require a finding of scienter, but instead requires that the commitment determination be based on a "`mental abnormality'" or "`personality disorder'"; thus, the Court concluded that the absence of a finding of scienter provides further evidence that the Kansas Act is not retributive.[44]
In concluding that the Act did not have deterrent objectives, the Court reasoned: "Those persons committed under the [Kansas] Act are, by definition, suffering from a `mental abnormality' or a `personality disorder' that prevents them from exercising adequate control over their behavior. Such persons are therefore unlikely to be deterred by the threat of confinement."[45]
The Court in Hendricks acknowledged that the Kansas Act imposed an affirmative disability or restraint, but concluded that an affirmative disability or restraint "`does not inexorably lead to the conclusion that the government has imposed punishment.'"[46] The Court explained:
The State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded. . . . The Court has, in fact, cited the confinement of "mentally unstable individuals who present a danger to the public" as one classic example of nonpunitive detention. . . . If detention for the purpose of protecting the community from harm necessarily constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held.[47]
The Court noted that although the Kansas Legislature afforded procedural safeguards similar to those used in a criminal context, the Kansas Act was not thereby transformed into a criminal proceeding.[48] Affording such procedural safeguards demonstrated only that the Kansas Legislature went to great lengths to confine only a small class of particularly dangerous individuals.[49]
The Court found it significant that under the Kansas Act, Hendricks' treatment occurred under the supervision of the Kansas Department of Health and Social and Rehabilitative Services and that he was not housed with the general prison population.[50] Instead, he was segregated from the general prison population operated by individuals not employed by the Department of Correctional Services.
Finally, the Court in Hendricks concluded:
Where the State has "disavowed any punitive intent"; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural *319 safe-guards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent.[51]
As such, the Court held that the Kansas Act was not punitive.
In the case at bar, J.R. does not dispute that the Legislature intended SOCA to be civil in nature. He also agrees that the Kansas Act considered constitutional by the U.S. Supreme Court in Hendricks is similar to SOCA. But J.R. argues that SOCA has two distinguishing differences from the Kansas Act considered in Hendricks and that those differences mandate a different conclusion about SOCA's constitutionality. First, J.R. notes that the Kansas Act, unlike SOCA, does not require a prior criminal conviction in order to be adjudged to be a dangerous sex offender. Second, J.R. argues that Hendricks is not controlling, because under SOCA, dangerous sex offenders are placed back into the general prison population prior to the hearing before the Board. But under the Kansas Act, sex offenders awaiting a hearing are segregated from the general prison population. From our own analysis of SOCA, we conclude that such differences are immaterial.

2. LEGISLATIVE INTENT PRONG
First, it is clear that the Legislature intended SOCA to be civil in nature. Whether the Legislature intended a statutory scheme to be civil or criminal is primarily a matter of statutory construction.[52] However, we must also look at the statute's structure and design.[53] The explicit purpose of SOCA is to protect the public from sex offenders who continue to pose a threat of harm to others.[54] Further, the Legislature stated in its committee statement that the purpose of SOCA was to create a separate legal standard for sex offenders under MHCA. And when looking at the structure and design, SOCA mirrors the procedures for civil commitments under MHCA, affords the same protections as MHCA, and is located in the civil code. Clearly, the Legislature intended SOCA to be a civil regulatory scheme.

3. EFFECTS OF SOCA
Second, J.R. has failed to meet his burden of providing the clearest proof that the effect of SOCA is so punitive in either purpose or effect as to negate the Legislature's intent.[55]
Although civil commitment under SOCA does impose an affirmative restraint, restricting the freedom of dangerous mentally ill persons is a legitimate governmental purpose that has been historically regarded as nonpunitive.[56] Thus, such restraint or affirmative disability may be applied to protect the public. In the case of emergency protective custody pending the hearing before the Board, convicted sex offenders are only held upon a showing of probable cause that custody is necessary and upon a prompt evaluation by a mental health professional concluding that the subject is a dangerous sex offender. The fact that SOCA imposes an affirmative disability or restraint does not negate the *320 Legislature's clear intent that SOCA be civil in nature.
Further, the fact that a finding of scienter is not required for civil commitment under SOCA provides evidence that SOCA is indeed a civil regulatory scheme. The determination of whether one is a dangerous sex offender who must be confined is made based on a mental abnormality or personality disorder and not on a finding of criminal intent.
Additionally, we are persuaded that SOCA was not meant to serve as a deterrent. Persons committed under SOCA are suffering from a mental disorder or personality disorder that prevents them from exercising control over their actions. As such, SOCA focuses on treating dangerous sex offenders and not on imposing a punishment. This is further evidenced by the fact that SOCA is modeled after and mirrors MHCA.
Even though SOCA's application is limited to convicted sex offenders, SOCA does not impose liability or punishment for criminal conduct. Instead, like the Kansas Act in Hendricks, prior convictions are used for evidentiary purposes. Specifically, requiring that the subject be convicted of a sex offense provides evidence of the subject's mental condition and helps predict future behavior.[57]
Additionally, SOCA is not excessive in relation to its assigned nonpunitive purpose, which is to protect the public and provide treatment to dangerous sex offenders who are likely to reoffend.[58] There is clearly a rational relation between the restriction on dangerous sex offenders' liberty and the statute's purpose of protecting the public by providing treatment for dangerous sex offenders in order to reduce the likelihood they will engage in such acts in the future. Moreover, SOCA not only requires that sex offenders receive a commitment hearing before the Board, but it also imposes a high standard of proof upon the State. To subject a dangerous sex offender to inpatient treatment, the State must prove by clear and convincing evidence that involuntary treatment is the least restrictive alternative.[59] Further, SOCA allows for the committed sex offender to request periodic review hearings by the Board to seek from the Board an order of discharge or a change in treatment.[60] These facts provide dispositive proof that SOCA is civil and not criminal in nature.[61] We determine that civil confinement under SOCA is reasonably related to the danger of recidivism and consistent with the regulatory objective, protecting the public from dangerous sex offenders.
Finally, we reject J.R.'s argument that the Kansas Act in Hendricks is meaningfully different from SOCA because SOCA, unlike the Kansas Act, requires a prior criminal conviction for a determination that a person is a dangerous sex offender.[62] Under SOCA, persons charged with a sexual offense, but not convicted, do not fall within the definition of a dangerous sex offender. While most statutes do not limit the definition of a dangerous sex offender to only those convicted of a sexual offense, those that do have been held by other courts not to be punitive or unconstitutional.[63] *321 Our Legislature merely limited SOCA's application to a smaller group of sex offenders. A civil commitment is not somehow transformed into a criminal proceeding simply because the Legislature has chosen to limit SOCA's application to those mentally ill persons who have actually been convicted of a sex offense.[64]
J.R.'s second attempt to distinguish SOCA from the Kansas Act found to be constitutional in Hendricks is also without merit. Under SOCA, sex offenders must generally remain in jail or a correctional facility while awaiting their hearing from the Board. In contrast, sex offenders awaiting a mental health hearing under the Kansas Act are placed under the supervision of the Kansas Department of Health and Social Rehabilitative Services. However, J.R. misinterprets the Court's conclusion in Hendricks. The Court in Hendricks found it significant that the defendant was placed under the supervision of the department after the hearing by the Board confirmed that the defendant was a dangerous sex offender.[65] The Court was concerned with the conditions of the confined persons once they are actually civilly committed. The Court did not discuss the conditions of confinement pending the mental health hearing.
We conclude the fact that convicted sex offenders are routinely placed in custody in a jail or correctional facility while awaiting their hearing does not override the Legislature's clear intent that SOCA be civil in nature.
Because J.R. failed to prove that the effects of SOCA are so punitive in either purpose or effect to negate the Legislature's intention, we conclude that SOCA is not punitive and is indeed civil. Therefore, SOCA does not violate the Ex Post Facto Clauses.

4. DOUBLE JEOPARDY
Next, J.R. argues that SOCA is punitive in nature and constitutes multiple punishments for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution and article I, § 12, of the Nebraska Constitution. The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.[66] The protection provided by Nebraska's double jeopardy clause is coextensive with that provided by the U.S. Constitution.[67]
In Hendricks, after finding that the Kansas Act was not punitive, the Court easily rejected the defendant's argument that the Kansas Act violated the Double Jeopardy Clause.[68] The Court stated that "as commitment under the [Kansas] Act is not tantamount to `punishment,' [the defendant's] involuntary detention does not violate the Double Jeopardy Clause, even though that confinement may follow a prison term."[69] Having already concluded in our ex post facto analysis that SOCA constitutes *322 a nonpunitive civil regulatory scheme, we similarly conclude that SOCA does not violate the Double Jeopardy Clause, because commitment under SOCA is not punishment.

5. EQUAL PROTECTION
Next, J.R. argues that because SOCA classifies a dangerous sex offender differently than a mentally ill individual under MHCA, SOCA violates the Equal Protection Clauses found in the 14th Amendment, § 1, to the U.S. Constitution and article 1, § 3, of the Nebraska Constitution. Specifically, J.R. maintains that SOCA violates equal protection principles, because it allows a dangerous sex offender to be committed following a diagnosis of a personality disorder. He alleges that this is a lower standard than required for commitment under MHCA, which requires a diagnosis of a mental illness or substance dependence.[70] Section 83-174.01(1)(b) provides that a dangerous sex offender is a person with a personality disorder, who has been convicted of two or more sex offenses, and is substantially unable to control his or her criminal behavior, J.R. does not meet this definition.
J.R. is a sex offender as defined under § 83-174.01(1)(a). He does not meet the definition of a dangerous sex offender under § 83-174.01(1)(b), the subsection he alleges violates equal protection. It is a long-standing rule that a person to whom a statute may be constitutionally applied will not be heard to challenge the statute on the ground that it might conceivably be applied unconstitutionally to others in situations not before court.[71] Because SOCA was constitutionally applied as to J.R., he does not have standing to raise an equal protection argument based on a provision that does not apply to him. Thus, J.R.'s argument is without merit.
J.R. also argues that SOCA violates the Equal Protection Clauses, because it allows dangerous sex offenders to be held in a jail or correctional facility while they await the hearing before the Boardunlike MHCA, which requires that a mentally ill person be placed in an appropriate medical facility.
Where a statute is challenged under the Equal Protection Clause, the general rule is that legislation is presumed to be valid, and the burden of establishing the unconstitutionality of the statute is on the one attacking its validity.[72]
The Equal Protection Clause of the 14th Amendment, § 1, mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[73] This clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike.[74] The initial inquiry in an equal protection analysis focuses on whether the challenger is similarly situated to another group for the purpose of the challenged governmental action. Absent this threshold showing, one lacks a viable equal protection claim.[75] In other words, the dissimilar treatment of dissimilarly situated *323 persons does not violate equal protection rights.[76]
In an equal protection challenge to a statute, the level of judicial scrutiny applied to a particular classification may be dispositive.[77] Legislative classifications involving either a suspect class or a fundamental right are analyzed with strict scrutiny, and legislative classifications not involving a suspect class or fundamental right are analyzed using rational basis review.[78]
It is undisputed that mental illness is not a suspect class and that neither state courts nor federal courts apply strict scrutiny to challenges similar to J.R.'s.[79] As such, SOCA will be scrutinized using rational basis review. Under this level of scrutiny, we will uphold a classification created by the Legislature where it has a rational means of promoting a legitimate government interest or purpose.[80] In other words, the difference in classification need only bear some relevance to the purpose for which the difference is made.[81] Under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.[82]
Mentally ill sex offenders are different from mentally ill persons who are not sex offenders due to the sexual nature of their crimes.[83] Sex offenders are generally more dangerous to others than are the mentally ill, because of the high probability of recidivism and the unique nature of their crimes. The Legislature has defined a dangerous sex offender as one who is substantially unable to control his or her desire or urge to commit sex offenses.[84] Dangerous sex offenders pose a greater harm to society because of their inability to control their behavior, which invariably results in harm to others. The mentally ill committed under MHCA on the other hand, do not necessarily cause harm to others with their actions.[85] Sex offenders are, therefore, not similarly situated to the mentally ill. As such, statutes that treat them differently do not violate equal protection.[86]
*324 Even assuming that mentally ill sex offenders are similarly situated to mentally ill persons committed under MHCA, this difference in classification is rational.[87] SOCA's purpose is to protect the public from dangerous sex offenders who have demonstrated their dangerous propensities by repeatedly committing sexual offenses. J.R. failed to eliminate any conceivable state of facts that could provide a rational basis for classifying dangerous sex offenders differently from the mentally ill, because allowing dangerous sex offenders who are presently confined to await the Board's hearing in a jail or correctional facility bears a rational relationship to the purpose of SOCA.[88]
A similar argument was rejected by our court in State v. Little.[89] In Little, the defendant argued that Nebraska's sociopath laws were violative of equal protection because incurably mentally ill, dangerous persons were confined at a regional center but sexual sociopaths were confined to the Nebraska Penal and Correctional Complex.[90] We concluded that the difference in classification was reasonable and stated: "[T]he public health and safety required that those previously convicted on a sex offense and deemed untreatable may be appropriately held in the Nebraska Penal and Correctional Complex rather than in the regional center due to the fact of the prior conviction of the crime."[91] A prerequisite of SOCA is a criminal conviction for a sex offense.[92] It is clearly a matter of administrative convenience for persons who are already incarcerated to be confined in a jail or correctional facility while awaiting their hearing. As such, we conclude that the Legislature had a reasonable basis for classifying dangerous sex offenders differently than the mentally ill under MHCA. Accordingly, J.R.'s argument is meritless.[93]
We conclude that the differences in classification between dangerous sex offenders and other mentally ill persons promote a legitimate state purpose and are rationally related to that purpose, protecting the public from dangerous sex offenders. As such, J.R.'s assignments of error involving equal protection violations are without merit.

6. CLEAR AND CONVINCING EVIDENCE
Finally, J.R. argues that the State failed to produce sufficient evidence that he is a dangerous sex offender; that there was a "recent act"[94]; and that inpatient, involuntary treatment is the least restrictive alternative. We disagree.

(a) Dangerous Sex Offender
In order for J.R. to be considered a dangerous sex offender, the State must prove by clear and convincing evidence that J.R. is likely to engage in repeat acts of sexual violence and that he is substantially unable to control his criminal behavior.[95] "Likely to engage in repeat acts of sexual violence means the person's propensity to commit sex offenses resulting *325 in serious harm to others is of such a degree as to pose a menace to the health and safety of the public."[96] Not being able to control criminal behavior means "having serious difficulty in controlling or resisting the desire or urge to commit sex offenses."[97]
The key to confinement of a mentally ill person lies in finding that the person is dangerous and that, absent confinement, the mentally ill person is likely to engage in particular acts which will result in substantial harm to himself or others.[98]
J.R. argues that in order for involuntary commitment under SOCA to comply with due process, the State was required to show that he has actually been dangerous in the recent past by providing evidence of an overt act, attempt, or threat to do substantial harm to himself or others. And J.R. argues that his conviction in 2000 is insufficient to prove that he committed a recent act that is probative of whether he will be dangerous in the future.
We have stated: "To comply with due process, there must be a finding that there is a substantial likelihood that dangerous behavior will be engaged in unless restraints are applied."[99] In determining whether a person is dangerous, the focus must be on the person's condition at the time of the commitment hearing.[100] The actions and statements of the person prior to the commitment hearing are probative of the person's present mental condition.[101] But, for a past act to have evidentiary value, the past act must have some foundation for a prediction of future dangerousness, thus being probative of that issue.[102]
In In re Interest of Blythman,[103] we considered whether a sexual assault that occurred 5 years before Theodore Blythman's commitment hearing was a "recent act." Since the time of the assault, Blythman was incarcerated. Blythman argued that if we were to conclude that the assault satisfies the recent act requirement, then involuntary civil commitment, regardless of how remote in time the act, threat, or violence was, would be permitted. We rejected this argument, stating: "[S]uch a result does not necessarily follow if it is kept in mind that any act that is used as evidence of dangerousness must be sufficiently probative to predict future behavior and the subject's present state of dangerousness."[104] We determined that Blythman's assault, which occurred 5 years before his commitment hearing, was probative of whether he was still dangerous and stated that "[t]his is particularly true since [Blythman] did not have an opportunity to commit a more recent act in the intervening years."[105] Further, we opined that the Legislature did not intend for a sex offender to be given the opportunity to commit a more recent act once a sufficient amount of time has passed since the last act in order to meet the recent act *326 requirement.[106]
At the time In re Interest of Blythman was decided, SOCA had not been enacted. Blythman was committed under MHCA. Under MHCA, the definition of a mentally ill and dangerous person was defined as someone who is mentally ill and poses a substantial risk of harm to others "as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm."[107] SOCA does not include § 71-908 in its definition. It is unclear whether the Legislature intended for the recent act requirement of § 71-908 to apply to SOCA.
Assuming without deciding that the recent act requirement must be fulfilled for J.R. to be adjudged a dangerous sex offender, we determine that the State satisfied such a requirement in this case. The State proved that J.R.'s sexual assaults on his girlfriend's daughter were probative to the issue of whether he is still a danger.
Skulsky testified that J.R. is a pedophile, suffers from cannabis dependence and depression, and has a personality disorder. Skulsky also testified that J.R. has inadequate emotional controls and that until successfully completing treatment, J.R. would have a hard time controlling his sexual urges. J.R. did not complete sex offender treatment while in prison. Considering this evidence, we believe that J.R.'s acts of sexual assaults on his girlfriend's daughter are probative on the issue of dangerousness.
J.R. asserts that the sexual assault is not probative of whether he is still dangerous, because he could have taken "advantage of opportunities to assault other children, [or] to further assault his victim" before being sentenced, but instead, he sought voluntary therapy.[108] J.R. was charged on May 8, 2000, and was sentenced on December 15. In March 2000, J.R. had sought professional counseling. However, J.R. sexually assaulted his girlfriend's daughter for a period of at least 5 years, and J.R. never sought treatment until his victim reported the assaults. Although J.R. did not reoffend immediately before being incarcerated, the fact that his sexual offenses continued for a period of at least 5 years remains probative of whether he is still dangerous.
J.R. also argues he cannot be characterized as a dangerous sex offender because his Static-99 results placed him at the lowest level to reoffend. This argument is without merit. First, we have never concluded that the results of the Static-99 are dispositive of whether a person is a dangerous sex offender. And, although J.R. scored a zero on the Static-99, the record indicates that the Static-99 may have underestimated J.R.'s risk for reoffending, because J.R.'s treatment staff still had concerns regarding that risk. Further, in Skulsky's professional opinion, despite the Static-99 results, J.R. still poses a danger to society. As such, we conclude that J.R.'s argument is without merit.
J.R. also attacks the credibility of Skulsky's opinion, arguing that Skulsky did not conduct a thorough evaluation. J.R.'s basis for such argument is that Skulsky did not consider a previous evaluation of J.R. that Skulsky had conducted. Skulsky explained that he did not consider this evaluation because of an issue regarding payment.
We consider the fact that the Board saw and heard Skulsky's testimony and observed his demeanor while testifying, *327 and give great weight to the Board's judgment as to credibility.[109] Skulsky testified that despite any prior assessments or any issues regarding payment, he accurately evaluated J.R. Specifically, Skulsky stated: "I wouldn't have agreed to [evaluate him] if I thought I'd be influenced about the current work." In our review, we give significant deference to the fact the Board found Skulsky's testimony credible. We also note that none of the previous evaluations that J.R. complains of were introduced into evidence. Presumably, J.R. would have introduced into evidence any previous evaluations if they were favorable. We conclude that Skulsky's evaluation was sufficient and probative of whether J.R. remains a danger to society.

(b) Least Restrictive Alternative
Next, we consider J.R.'s assertion that inpatient, involuntary treatment was not the least restrictive alternative. He argues that the State failed to produce sufficient evidence that he is still dangerous and that the State failed to provide any evidence why inpatient, involuntary treatment is the least restrictive alternative.
J.R. relies on the fact that he has contacted treatment facilities in anticipation of his release. However, according to Skulsky, inpatient, involuntary treatment is the least restrictive alternative, because if J.R. were to be released into society without further treatment, the threat of harm would be great. Skulsky stated that "given the personality diagnoses of emotional disturbance, Pedophilia, combined with the lack of successful treatment of sex offender issues indicates [sic] that [J.R.] still needs treatment on an inpatient locked unit."
Moreover, the record does not indicate that J.R. has ever successfully completed treatment in the past, including the voluntary treatment he sought before sentencing. Considering that the Board had the opportunity to observe Skulsky's testimony, we cannot conclude that the Board's finding that inpatient, involuntary treatment is the least restrictive alternative was not supported by clear and convincing evidence.
The order of the district court affirming the Board's action is supported by clear and convincing evidence that J.R. is a dangerous sex offender and that neither voluntary hospitalization nor other treatment alternatives less restrictive of J.R.'s liberty are available.

VI. CONCLUSION
We conclude that SOCA is civil in nature and that, therefore, it may be applied retroactively without violating principles of double jeopardy or ex post facto. Additionally, we conclude that SOCA does not violate the Equal Protection Clauses, as dangerous sex offenders are not similarly situated to other non-sex-related offenders and because the Legislature had a rational and legitimate basis for treating sex offenders differently than the mentally ill. Finally, we conclude that the Board's finding that J.R. is a dangerous sex offender was supported by clear and convincing evidence. As such, we affirm the judgment of the district court.
AFFIRMED.
NOTES
[1] Neb.Rev.Stat. §§ 71-1201 to 71-1226 (Cum. Supp.2008).
[2] State v. Worm, 268 Neb. 74, 680 N.W.2d 151 (2004).
[3] Id.
[4] Gourley v. Nebraska Methodist Health Sys., 265 Neb. 918, 663 N.W.2d 43 (2003).
[5] In re Interest of Kochner, 266 Neb. 114, 662 N.W.2d 195 (2003).
[6] See. In re Interest of Michael U., 273 Neb. 198, 728 N.W.2d 116 (2007); In re Interest of Kochner, supra note 5.
[7] §§ 71-1201 through 71-1226.
[8] § 71-1202.
[9] Committee Statement, L.B. 1199, Judiciary Committee, 99th Leg., 2d Sess. (Feb. 16, 2006). See Neb.Rev.Stat. §§ 71-901 to 71-962 (Reissue 2003 & Cum.Supp.2008).
[10] § 83-174.01(1).
[11] § 71-1208.
[12] §§ 71-919(1) and 71-921(2).
[13] § 71-919(2)(a).
[14] § 71-919(2)(b).
[15] § 71-919(4).
[16] Id.
[17] § 71-1209.
[18] § 71-1210.
[19] Id.
[20] § 71-1216.
[21] Id.
[22] §§ 71-1209 and 71-1219.
[23] Poindexter v. Houston, 275 Neb. 863, 750 N.W.2d 688 (2008).
[24] Slansky v. Nebraska State Patrol, 268 Neb. 360, 685 N.W.2d 335 (2004).
[25] State v. Worm, supra note 2.
[26] Id. See Slansky v. Nebraska State Patrol, supra note 24.
[27] See State v. Worm, supra note 2.
[28] 57 C.J.S. Mental Health § 289 (2007). See, Seling v. Young, 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001); In re Detention of Ewoldt, 634 N.W.2d 622 (Iowa 2001); In re Allen, 351 S.C. 153, 568 S.E.2d 354 (2002); State v. Carpenter, 197 Wis.2d 252, 541 N.W.2d 105 (1995).
[29] Id.
[30] See State v. Worm, supra note 2. See, also, Smith v. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003); Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).
[31] See State v. Worm, supra note 2. See, also, Kansas v. Hendricks, supra note 30.
[32] See State v. Worm, supra note 2. See, also, Kansas v. Hendricks, supra note 30; Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).
[33] Kansas v. Hendricks, supra note 30.
[34] Kansas v. Hendricks, supra note 30, 521 U.S. at 361, 117 S.Ct. 2072.
[35] Id. (citations omitted).
[36] Id. (emphasis omitted).
[37] Kansas v. Hendricks, supra note 30.
[38] Id.
[39] Id.
[40] Id., 521 U.S. at 362, 117 S.Ct. 2072.
[41] See Kan. Stat. Ann. § 59-29a03(a) (2005).
[42] See Kan. Stat. Ann. § 59-29a02(a) (Cum. Supp.2008).
[43] Kansas v. Hendricks, supra note 30.
[44] Id., 521 U.S. at 362, 117 S.Ct. 2072.
[45] Id., 521 U.S. at 362-63, 117 S.Ct. 2072.
[46] Id., 521 U.S. at 363, 117 S.Ct. 2072.
[47] Id. (citations omitted) (emphasis in original).
[48] Kansas v. Hendricks, supra note 30.
[49] Id.
[50] Id.
[51] Id., 521 U.S. at 368-69, 117 S.Ct. 2072.
[52] State v. Worm, supra note 2.
[53] Id.
[54] § 71-1203.
[55] See State v. Worm, supra note 2.
[56] See Kansas v. Hendricks, supra note 30.
[57] See, Welvaert v. Nebraska State Patrol, 268 Neb. 400, 683 N.W.2d 357 (2004); State v. Worm, supra note 2.
[58] § 71-1202.
[59] § 71-1209.
[60] § 71-1219.
[61] See, Kansas v. Hendricks, supra note 30; § 83-174.01.
[62] See § 59-29a03.
[63] Allen v. Illinois, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986); Woodard v. Mayberg, 242 F.Supp.2d 695 (N.D.Cal.2003); State v. Carpenter, supra note 28.
[64] See, Allen v. Illinois, supra note 63; State v. Carpenter, supra note 28.
[65] Kansas v. Hendricks, supra note 30.
[66] State v. Winkler, 266 Neb. 155, 663 N.W.2d 102 (2003).
[67] State v. Miner, 273 Neb. 837, 733 N.W.2d 891 (2007).
[68] Kansas v. Hendricks, supra note 30.
[69] Id., 521 U.S. at 369, 117 S.Ct. 2072.
[70] See § 71-908.
[71] See, State v. Burke, 225 Neb. 625, 408 N.W.2d 239 (1987); State v. Greaser, 207 Neb. 668, 300 N.W.2d 197 (1981); State v. Brown, 191 Neb. 61, 213 N.W.2d 712 (1974).
[72] See Kenley v. Neth, 271 Neb. 402, 712 N.W.2d 251 (2006).
[73] See Pfizer v. Lancaster Cty. Bd. of Equal., 260 Neb. 265, 616 N.W.2d 326 (2000).
[74] Id.
[75] Hass v. Neth, 265 Neb. 321, 657 N.W.2d 11 (2003); Benitez v. Rasmussen, 261 Neb. 806, 626 N.W.2d 209 (2001).
[76] Kenley v. Neth, supra note 72.
[77] State v. Senters, 270 Neb. 19, 699 N.W.2d 810 (2005).
[78] See id.
[79] See, In re Treatment and Care of Luckabaugh, 351 S.C. 122, 568 S.E.2d 338 (2002) (citing In re Detention of Williams, 628 N.W.2d 447 (Iowa 2001); In re Detention of Samuelson, 189 Ill.2d 548, 727 N.E.2d 228, 244 Ill.Dec. 929 (2000); Detention of Turay, 139 Wash.2d 379, 986 P.2d 790 (1999); and Martin v. Reinstein, 195 Ariz. 293, 987 P.2d 779 (Ct.App.1999)).
[80] See State ex rel. Johnson v. Gale, 273 Neb. 889, 734 N.W.2d 290 (2007).
[81] See State v. Simants, 213 Neb. 638, 330 N.W.2d 910 (1983).
[82] Citizens for Eq. Ed. v. Lyons-Decatur Sch. Dist., 274 Neb. 278, 739 N.W.2d 742 (2007).
[83] See, State v. Little, 199 Neb. 772, 261 N.W.2d 847 (1978); Martin v. Reinstein, supra note 79; Westerheide v. State, 831 So.2d 93 (Fla.2002); In re Detention of Garren, 620 N.W.2d 275 (Iowa 2000); In re Care & Treatment of Hay, 263 Kan. 822, 953 P.2d 666 (1998); In re Blodgett, 510 N.W.2d 910 (Minn. 1994).
[84] § 83-174.01.
[85] § 71-908(2). See Martin v. Reinstein, supra note 79.
[86] See State v. Little, supra note 83.
[87] See, In re Detention of Williams, supra note 79; In re Treatment and Care of Luckabaugh, supra note 79; In re Care and Treatment of Norton, 123 S.W.3d 170 (Mo.2003).
[88] See, In re Morrow, 616 N.W.2d 544 (Iowa 2000); Thompson, petitioner, 394 Mass. 502, 476 N.E.2d 216 (1985); Detention of Petersen, 138 Wash.2d 70, 980 P.2d 1204 (1999).
[89] State v. Little, supra note 83.
[90] Id.
[91] Id. at 777-78, 261 N.W.2d at 851.
[92] § 83-174.01.
[93] See In re Detention of Samuelson, supra note 79.
[94] Brief for appellant at 22.
[95] See § 83-174.01(1).
[96] § 83-174.01(2).
[97] § 83-174.01(6).
[98] In re Interest of Blythman, 208 Neb. 51, 302 N.W.2d 666 (1981).
[99] In re Interest of Blythman, supra note 98, 208 Neb. at 57, 302 N.W.2d at 671.
[100] In re Interest of Blythman, supra note 98.
[101] Id.
[102] See id.
[103] Id.
[104] Id. at 59, 302 N.W.2d at 672.
[105] Id.
[106] Id.
[107] § 71-908(1).
[108] Brief for appellant at 23.
[109] See Huffman v. Peterson, 272 Neb. 62, 718 N.W.2d 522 (2006).